## UNITED STATES *v.* E. C. KNIGHT COMPANY.

APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE THIRD
CIRCUIT.

No. 675.   Argued October 24, 1894. — Decided January 21, 1895.

The monopoly and restraint denounced by the act of July 2, 1890, c. 647, 26
Stat. 209, "to protect trade and con.merce against unlawful restraints
and monopolies," are a monopoly in interstate and international trade
or commerce, and not a monopoly in the manufacture of a necessary of
life.

The American Sugar Refining Company, a corporation existing under the
laws of the State of New Jersey, being in control of a large majority of
the manufactories of refined sugar in the United States, acquired, through
the purchase of stock in four Philadelphia refineries, such disposition
over those manufactories throughout the United States as gave it a
practical monopoly of the business. *Held*, that the result of the transac-
tion was the creation of a monopoly in the manufacture of a necessary
of life, which could not be suppressed under the provisions of the act
of July 2, 1890, c. 647, 26 Stat. 209, "to protect trade and commerce
against unlawful restraints and monopolies," in the mode attempted in
this suit; and that the acquisition of Philadelphia refineries by a New
Jersey corporation, and the business of sugar refining in Pennsylvania,
bear no direct relation to commerce between the States or with foreign
nations.

1

THIS was a bill filed by the United States against E. C. Knight Company and others, in the Circuit Court of the United States for the Eastern District of Pennsylvania, charging that the defendants had violated the provisions of an act of Congress approved July 2, 1890, c. 647, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," 26 Stat. 209, "providing that every contract, combination in the form of trust, or otherwise, or conspiracy in restraint of trade and commerce among the several States is illegal, and that persons who shall monopolize or shall attempt to monopolize, or combine or conspire with other persons to monopolize trade and commerce among the several States, shall be guilty of a misdemeanor." The bill alleged that the defendant, the American Sugar Refining Company, was incorporated under and by virtue of the laws of New Jersey, whose certificate of incorporation named the places in New Jersey and New York at which its principal business was to be transacted, and several other States in which it proposed to carry on operations, and stated that the objects for which said company was formed were "the purchase, manufacture, refining, and sale of sugar, molasses, and melads, and all lawful business incidental thereto;" that the defendant, E. C. Knight Company, was incorporated under the laws of Pennsylvania "for the purpose of importing, manufacturing, refining and dealing in sugars and molasses," at the city of Philadelphia; that the defendant, the Franklin Sugar Company, was incorporated under the laws of Pennsylvania "for the purpose of the manufacture of sugar and the purchase of raw material for that purpose," at Philadelphia; that the defendant, Spreckels Sugar Refining Company, was incorporated under the laws of Pennsylvania "for the purpose of refining sugar, which will involve the buying of the raw material therefor and selling the manufactured product, and of doing whatever else shall be incidental to the said business of refining," at the city of Philadelphia; that the defendant, the Delaware Sugar House, was incorporated under the laws of Pennsylvania "for the purpose of the manufacture of sugar and syrups, and preparing the same for

market, and the transaction of such work or business as may be necessary or proper for the proper management of the business of manufacture."

It was further averred that the four defendants last named were independently engaged in the manufacture and sale of sugar until on or about March 4, 1892; that the product of their refineries amounted to thirty-three per cent of the sugar refined in the United States; that they were competitors with the American Sugar Refining Company; that the products of their several refineries were distributed among the several States of the United States, and that all the companies were engaged in trade or commerce with the several States and with foreign nations; that the American Sugar Refining Company had, on or prior to March 4, 1892, obtained the control of all the sugar refineries of the United States with the exception of the Revere of Boston, and the refineries of the four defendants above mentioned; that the Revere produced annually about two per cent of the total amount of sugar refined.

The bill then alleged that in order that the American Sugar Refining Company might obtain complete control of the price of sugar in the United States, that company, and John E. Searles, Jr., acting for it, entered into an unlawful and fraudulent scheme to purchase the stock, machinery, and real estate of the other four corporations defendant, by which they attempted to control all the sugar refineries for the purpose of restraining the trade thereof with other States as theretofore carried on independently by said defendants; that in pursuance of this scheme, on or about March 4, 1892, Searles entered into a contract with the defendant Knight Company and individual stockholders named, for the purchase of all the stock of that company, and subsequently delivered to the defendants therefor in exchange shares of the American Sugar Refining Company; that on or about the same date Searles entered into a similar contract with the Spreckels Company and individual stockholders, and with the Franklin Company and stockholders, and with the Delaware Sugar House and stockholders. It was further averred that the American Sugar Refining Company monopolized the manufacture and

sale of refined sugar in the United States, and controlled the price of sugar; that in making the contracts, Searles and the American Sugar Refining Company combined and conspired with the other defendants to restrain trade and commerce in refined sugar among the several States and foreign nations, and that the said contracts were made with the intent to enable the American Sugar Refining Company to restrain the sale of refined sugar in Pennsylvania and among the several States, and to increase the regular price at which refined sugar was sold, and thereby to exact and secure large sums of money from the State of Pennsylvania, and from the other States of the United States, and from all other purchasers, and that the same was unlawful and contrary to the said act.

The bill called for answers under oath, and prayed —

"1. That all and each of the said unlawful agreements made and entered into by and between the said defendants, on or about the fourth day of March, 1892, shall be delivered up, cancelled, and declared to be void; and that the said defendants, the American Sugar Refining Company and John E. Searles, Jr., be ordered to deliver to the other said defendants respectively the shares of stock received by them in performance of the said contracts; and that the other said defendants be ordered to deliver to the said defendants, the American Sugar Refining Company and John E. Searles, Jr., the shares of stock received by them respectively in performance of the said contracts.

"2. That an injunction issue preliminary until the final determination of this cause, and perpetual thereafter, preventing and restraining the said defendants from the further performance of the terms and conditions of the said unlawful agreements.

"3. That an injunction may issue preventing and restraining the said defendants from further and continued violations of the said act of Congress, approved July 2, 1890.

"4. Such other and further relief as equity and justice may require in the premises."

Answers were filed and evidence taken, which was thus

sufficiently summarized by Judge Butler in his opinion in the Circuit Court:

"The material facts proved are that the American Sugar Refining Co., one of the defendants, is incorporated under the laws of New Jersey, and has authority to purchase, refine, and sell sugar; that the Franklin Sugar Refinery, the E. C. Knight Co., the Spreckels Sugar Refinery, and the Delaware Sugar House, were incorporated under the laws of Pennsylvania, and authorized to purchase, refine, and sell sugar; that the four latter Pennsylvania companies were located in Philadelphia, and prior to March, 1892, produced about thirty-three per cent of the total amount of sugar refined in the United States, and were in active competition with the American Sugar Refining Co., and with each other, selling their product wherever demand was found for it throughout the United States; that prior to March, 1892, the American Sugar Refining Co. had obtained control of all refineries in the United States, excepting the four located in Philadelphia, and that of the Revere Co. in Boston, the latter producing about two per cent of the amount refined in this country; that in March, 1892, the American Sugar Refining Co. entered into contracts (on different dates) with the stockholders of each of the Philadelphia corporations named, whereby it purchased their stock, paying therefor by transfers of stock in its company; that the American Sugar Refining Co. thus obtained possession of the Philadelphia refineries and their business; that each of the purchases was made subject to the American Sugar Refining Co. obtaining authority to increase its stock $25,000,000; that this assent was subsequently obtained and the increase made; that there was no understanding or concert of action between the stockholders of the several Philadelphia companies respecting the sales, but that those of each company acted independently of those of the others, and in ignorance of what was being done by such others; that the stockholders of each company acted in concert with each other, understanding and intending that all the stock and property of the company should be sold; that the contract of sale in each instance left the sellers free to establish other refineries

and continue the business if they should see fit to do so, and contained no provision respecting trade or commerce in sugar, and that no arrangement or provision on this subject has been made since; that since the purchase the Delaware Sugar House Refinery has been operated in conjunction with the Spreckels Refinery, and the E. C. Knight Refinery in connection with the Franklin, this combination being made apparently for reasons of economy in conducting the business; that the amount of sugar refined in Philadelphia has been increased since the purchases; that the price has been slightly advanced since that event, but is still lower than it had been for some years before, and up to within a few months of the sales; that about ten per cent of the sugar refined and sold in the United States is refined in other refineries than those controlled by the American Sugar Refining Co.; that some additional sugar is produced in Louisiana and some is brought from Europe, but the amount is not large in either instance.

"The object in purchasing the Philadelphia refineries was to obtain a greater influence or more perfect control over the business of refining and selling sugar in this country."

The Circuit Court held that the facts did not show a contract, combination, or conspiracy to restrain or monopolize trade or commerce "among the several States or with foreign nations," and dismissed the bill. 60 Fed. Rep. 306. The cause was taken to the Circuit Court of Appeals for the Third Circuit, and the decree affirmed. 60 Fed. Rep. 934. This appeal was then prosecuted. The act of Congress of July 2, 1890, c. 647, is as follows:

"An act to protect trade and commerce against unlawful restraints and monopolies.

"Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding five thousand dollars, or by imprisonment not exceeding one

year, or by both said punishments, in the discretion of the court.

"Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 3. Every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is hereby declared illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by a fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court.

"Sec. 4. The several Circuit Courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary

restraining order or prohibition as shall be deemed just in the premises.

"SEC. 5. Whenever it shall appear to the court before which any proceeding under section four of this act may be pending, that the ends of justice require that other parties should be brought before the court, the court may cause them to be summoned, whether they reside in the district in which the court is held or not; and subpœnas to that end may be served in any district by the marshal thereof.

"SEC. 6. Any property owned under any contract or by any combination, or pursuant to any conspiracy (and being the subject thereof) mentioned in section one of this act, and being in the course of transportation from one State to another, or to a foreign country, shall be forfeited to the United States, and may be seized and condemned by like proceedings as those provided by law for the forfeiture, seizure, and condemnation of property imported into the United States contrary to law.

"SEC. 7. Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any Circuit Court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee.

"SEC. 8. That the word 'person,' or 'persons,' wherever used in this act, shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country." 26 Stat. 209, c. 647.

*Mr. Solicitor General* and *Mr. S. F. Phillips*, (with whom was *Mr. Attorney General* on the brief,) for appellants.

*Mr. John G. Johnson*, (with whom was *Mr. John E. Parsons* on the brief,) for appellees.

MR. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

By the purchase of the stock of the four Philadelphia refineries, with shares of its own stock, the American Sugar Refining Company acquired nearly complete control of the manufacture of refined sugar within the United States. The bill charged that the contracts under which these purchases were made constituted combinations in restraint of trade, and that in entering into them the defendants combined and conspired to restrain the trade and commerce in refined sugar among the several States and with foreign nations, contrary to the act of Congress of July 2, 1890.

The relief sought was the cancellation of the agreements under which the stock was transferred; the redelivery of the stock to the parties respectively; and an injunction against the further performance of the agreements and further violations of the act. As usual, there was a prayer for general relief, but only such relief could be afforded under that prayer as would be agreeable to the case made by the bill and consistent with that specifically prayed. And as to the injunction asked, that relief was ancillary to and in aid of the primary equity, or ground of suit, and, if that failed, would fall with it. That ground here was the existence of contracts to monopolize interstate or international trade or commerce, and to restrain such trade or commerce, which, by the provisions of the act, could be rescinded, or operations thereunder arrested.

In commenting upon the statute, 21 Jac. 1, c. 3, at the commencement of chapter 85 of the third Institute, entitled "Against Monopolists, Propounders, and Projectors," Lord Coke, in language often quoted, said:

"It appeareth by the preamble of this act (as a judgment in Parliament) that all grants of monopolies are against the ancient and fundamentall laws of this Kingdome. And therefore it is necessary to define what a monopoly is.

"A monopoly is an institution, or allowance by the King by his grant, commission, or otherwise to any person or persons, bodies politique, or corporate, of or for the sole

buying, selling, making, working, or using of anything, whereby any person or persons, bodies politique, or corporate, are sought to be restrained of any freedome or liberty that they had before, or hindred in their lawfull trade.

"For the word monopoly, *dicitur ἀπό τȣ μόνȣ,* (i. *solo,*) *καὶ πωλέομαι,* (i. *vendere,*) *quod est cum unus solus aliquod genus mercaturœ universum vendit, ut solus vendat, pretium ad suum libitum statuens:* hereof you may read more at large in that case. Trin. 44 Eliz. Lib. 11, f. 84, 85; *le case de monopolies."* 3 Inst. 181.

Counsel contend that this definition, as explained by the derivation of the word, may be applied to all cases in which "one person sells alone the whole of any kind of marketable thing, so that only he can continue to sell it, fixing the price at his own pleasure," whether by virtue of legislative grant or agreement; that the monopolization referred to in the act of Congress is not confined to the common law sense of the term as implying an exclusive control, by authority, of one branch of industry without legal right of any other person to interfere therewith by competition or otherwise, but that it includes engrossing as well, and covers controlling the market by contracts securing the advantage of selling alone or exclusively all, or some considerable portion, of a particular kind of merchandise or commodity to the detriment of the public; and that such contracts amount to that restraint of trade or commerce declared to be illegal. But the monopoly and restraint denounced by the act are the monopoly and restraint of interstate and international trade or commerce, while the conclusion to be assumed on this record is that the result of the transaction complained of was the creation of a monopoly in the manufacture of a necessary of life.

In the view which we take of the case, we need not discuss whether because the tentacles which drew the outlying refineries into the dominant corporation were separately put out, therefore there was no combination to monopolize; or, because, according to political economists, aggregations of capital may reduce prices, therefore the objection to concentration of power is relieved; or, because others were theoretically left

free to go into the business of refining sugar, and the original stockholders of the Philadelphia refineries after becoming stockholders of the American Company might go into competition with themselves, or, parting with that stock, might set up again for themselves, therefore no objectionable restraint was imposed.

The fundamental question is, whether conceding that the existence of a monopoly in manufacture is established by the evidence, that monopoly can be directly suppressed under the act of Congress in the mode attempted by this bill.

It cannot be denied that the power of a State to protect the lives, health, and property of its citizens, and to preserve good order and the public morals, "the power to govern men and things within the limits of its dominion," is a power originally and always belonging to the States, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States, and essentially exclusive. The relief of the citizens of each State from the burden of monopoly and the evils resulting from the restraint of trade among such citizens was left with the States to deal with, and this court has recognized their possession of that power even to the extent of holding that an employment or business carried on by private individuals, when it becomes a matter of such public interest and importance as to create a common charge or burden upon the citizen; in other words, when it becomes a practical monopoly, to which the citizen is compelled to resort and by means of which a tribute can be exacted from the community, is subject to regulation by state legislative power. On the other hand, the power of Congress to regulate commerce among the several States is also exclusive. The Constitution does not provide that interstate commerce shall be free, but, by the grant of this exclusive power to regulate it, it was left free except as Congress might impose restraints. Therefore it has been determined that the failure of Congress to exercise this exclusive power in any case is an expression of its will that the subject shall be free from restrictions or impositions upon it by the several States, and if a law passed by a State in the exercise of its acknowledged powers comes into conflict

with that will, the Congress and the State cannot occupy the position of equal opposing sovereignties, because the Constitution declares its supremacy and that of the laws passed in pursuance thereof; and that which is not supreme must yield to that which is supreme. "Commerce, undoubtedly, is traffic," said Chief Justice Marshall, "but it is something more; it is intercourse. It describes the commercial intercourse between nations and parts of nations in all its branches, and is regulated by prescribing rules for carrying on that intercourse." That which belongs to commerce is within the jurisdiction of the United States, but that which does not belong to commerce is within the jurisdiction of the police power of the State. *Gibbons* v. *Ogden*, 9 Wheat. 1, 189, 210; *Brown* v. *Maryland*, 12 Wheat. 419, 448; *The License Cases*, 5 How. 504, 599; *Mobile* v. *Kimball*, 102 U. S. 691; *Bowman* v. *Chicago & N. W. Railway*, 125 U. S. 465; *Leisy* v. *Hardin*, 135 U. S. 100; *In re Rahrer*, 140 U. S. 545, 555.

The argument is that the power to control the manufacture of refined sugar is a monopoly over a necessary of life, to the enjoyment of which by a large part of the population of the United States interstate commerce is indispensable, and that, therefore, the general government in the exercise of the power to regulate commerce may repress such monopoly directly and set aside the instruments which have created it. But this argument cannot be confined to necessaries of life merely, and must include all articles of general consumption. Doubtless the power to control the manufacture of a given thing involves in a certain sense the control of its disposition, but this is a secondary and not the primary sense; and although the exercise of that power may result in bringing the operation of commerce into play, it does not control it, and affects it only incidentally and indirectly. Commerce succeeds to manufacture, and is not a part of it. The power to regulate commerce is the power to prescribe the rule by which commerce shall be governed, and is a power independent of the power to suppress monopoly. But it may operate in repression of monopoly whenever that comes within the rules by which commerce is governed or whenever the transaction is itself a monopoly of commerce.

It is vital that the independence of the commercial power and of the police power, and the delimitâtion between them, however sometimes perplexing, should always be recognized and observed, for while the one furnishes the strongest bond of union, the other is essential to the preservation of the autonomy of the States as required by our dual form of government; and acknowledged evils, however grave · and urgent they may appear to be, had better be borne, than the risk be run, in the effort to suppress them, of more serious consequences by resort to expedients of even doubtful constitutionality.

It will be perceived how far-reaching the proposition is that the power of dealing with a monopoly directly may be exercised by the general government whenever interstate or international commerce may be ultimately affected. The regulation of commerce applies to tne subjects of commerce and not to matters of internal police. Contracts to buy, sell, or exchange goods to be transported among the several States, the transportation and its instrumentalities, and articles bought, sold, or exchanged for the purposes of such transit among the States, or put in the way of transit, may be regulated, but this is because they form part of interstate trade or commerce. The fact that an article is manufactured for export to another State does not of itself make it an article of interstate commerce, and the intent of the manufacturer does not determine the time when the article or product passes from the control of the State and belongs to commerce. This was so ruled in *Coe* v. *Errol,* 116 U. S. 517, 525, in which the question before the court was whether certain logs cut at a place in New Hampshire and hauled to a river town for the purpose of transportation to the State of Maine were liable to be taxed like other property in the State of New Hampshire. Mr. Justice Bradley, delivering the opinion of the court, said: "Does the owner's state of mind in relation to the goods, that is, his intent to export them, and his partial preparation to do so, exempt them from taxation? This is the precise question for solution. . . . There must be a point of time when they cease to be governed exclusively by the domestic

law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement from the State of their origin to that of their destination."

And again, in *Kidd* v. *Pearson*, 128 U. S. 1, 20, 21, 22, where the question was discussed whether the right of a State to enact a statute prohibiting within its limits the manufacture of intoxicating liquors, except for certain purposes, could be overthrown by the fact that the manufacturer intended to export the liquors when made, it was held that the intent of the manufacturer did not determine the time when the article or product passed from the control of the State and belonged to commerce, and that, therefore, the statute, in omitting to except from its operation the manufacture of intoxicating liquors within the limits of the State for export, did not constitute an unauthorized interference with the right of Congress to regulate commerce. And Mr. Justice Lamar remarked: " No distinction is more popular to the common mind, or more clearly expressed in economic and political literature, than that between manufacture and commerce. Manufacture is transformation — the fashioning of raw materials into a change of form for use. The functions of commerce are different. The buying and selling and the transportation incidental thereto constitute commerce; and the regulation of commerce in the constitutional sense embraces the regulation at least of such transportation. . . . If it be held that the term includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that Congress would be invested, to the exclusion of the States, with the power to regulate, not only manufactures, but also agriculture, horticulture, stock raising, domestic fisheries, mining — in short, every branch of human industry. For is there one of them that does not contemplate, more or less clearly, an interstate or foreign market? Does not the wheat grower of the Northwest or the cotton planter of the

South, plant, cultivate, and harvest his crop with an eye on the prices at Liverpool, New York, and Chicago? The power being vested in Congress and denied to the States, it would follow as an inevitable result that the duty would devolve on Congress to regulate all of these delicate, multiform and vital interests — interests which in their nature are and must be local in all the details of their successful management. . . . The demands of such a supervision would require, not uniform legislation generally applicable throughout the United States, but a swarm of statutes only locally applicable and utterly inconsistent. Any movement toward the establishment of rules of production in this vast country, with its many different climates and opportunities, could only be at the sacrifice of the peculiar advantages of a large part of the localities in it, if not of every one of them. On the other hand, any movement toward the local, detailed and incongruous legislation required by such interpretation would be about the widest possible departure from the declared object of the clause in question. Nor this alone. Even in the exercise of the power contended for, Congress would be confined to the regulation, not of certain branches of industry, however numerous, but to those instances in each and every branch where the producer contemplated an interstate market. These instances would be almost infinite, as we have seen; but still there would always remain the possibility, and often it would be the case, that the producer contemplated a domestic market. In that case the supervisory power must be executed by the State; and the interminable trouble would be presented, that whether the one power or the other should exercise the authority in question would be determined, not by any general or intelligible rule, but by the secret and changeable intention of the producer in each and every act of production. A situation more paralyzing to the state governments, and more provocative of conflicts between the general government and the States, and less likely to have been what the framers of the Constitution intended, it would be difficult to imagine." And see *Veazie* v. *Moor,* 14 How. 568, 574.

In *Gibbons* v. *Ogden, Brown* v. *Maryland,* and other cases

often cited, the state laws, which were held inoperative, were instances of direct interference with, or regulations of, interstate or international commerce; yet in *Kidd* v. *Pearson* the refusal of a State to allow articles to be manufactured within her borders even for export was held not to directly affect external commerce, and state legislation which, in a great variety of ways, affected interstate commerce and persons engaged in it, has been frequently sustained because the interference was not direct.

Contracts, combinations, or conspiracies to control domestic enterprise in manufacture, agriculture, mining, production in all its forms, or to raise or lower prices or wages, might unquestionably tend to restrain external as well as domestic trade, but the restraint would be an indirect result, however inevitable and whatever its extent, and such result would not necessarily determine the object of the contract, combination, or conspiracy.

Again, all the authorities agree that in order to vitiate a contract or combination it is not essential that its result should be a complete monopoly; it is sufficient if it really tends to that end and to deprive the public of the advantages which flow from free competition. Slight reflection will show that if the national power extends to all contracts and combinations in manufacture, agriculture, mining, and other productive industries, whose ultimate result may affect external commerce, comparatively little of business operations and affairs would be left for state control.

It was in the light of well-settled principles that the act of July 2, 1890, was framed. Congress did not attempt thereby to assert the power to deal with monopoly directly as such; or to limit and restrict the rights of corporations created by the States or the citizens of the States in the acquisition, control, or disposition of property; or to regulate or prescribe the price or prices at which such property or the products thereof should be sold; or to make criminal the acts of persons in the acquisition and control of property which the States of their residence or creation sanctioned or permitted. Aside from the provisions applicable where Congress might exercise mu-

nicipal power, what the law struck at was combinations, contracts, and conspiracies to monopolize trade and commerce among the several States or with foreign nations; but the contracts and acts of the defendants related exclusively to the acquisition of the Philadelphia refineries and the business of sugar refining in Pennsylvania, and bore no direct relation to commerce between the States or with foreign nations. The object was manifestly private gain in the manufacture of the commodity, but not through the control of interstate or foreign commerce. It is true that the bill alleged that the products of these refineries were sold and distributed among the several States, and that all the companies were engaged in trade or commerce with the several States and with foreign nations; but this was no more than to say that trade and commerce served manufacture to fulfil its function. Sugar was refined for sale, and sales were probably made at Philadelphia for consumption, and undoubtedly for resale by the first purchasers throughout Pennsylvania and other States, and refined sugar was also forwarded by the companies to other States for sale. Nevertheless it does not follow that an attempt to monopolize, or the actual monopoly of, the manufacture was an attempt, whether executory or consummated, to monopolize commerce, even though, in order to dispose of the product, the instrumentality of commerce was necessarily invoked. There was nothing in the proofs to indicate any intention to put a restraint upon trade or commerce, and the fact, as we have seen, that trade or commerce might be indirectly affected was not enough to entitle complainants to a decree. The subject-matter of the sale was shares of manufacturing stock, and the relief sought was the surrender of property which had already passed and the suppression of the alleged monopoly in manufacture by the restoration of the *status quo* before the transfers; yet the act of Congress only authorized the Circuit Courts to proceed by way of preventing and restraining violations of the act in respect of contracts, combinations, or conspiracies in restraint of interstate or international trade or commerce.

The Circuit Court declined, upon the pleadings and proofs,

to grant the relief prayed, and dismissed the bill, and we are of opinion that the Circuit Court of Appeals did not err in affirming that decree.

*Decree affirmed.*

Mr. Justice Harlan, dissenting.

Prior to the 4th day of March, 1892, the American Sugar Refining Company, a corporation organized under a general statute of New Jersey for the purpose of buying, manufacturing, refining, and *selling sugar in different parts of the country*, had obtained the control of *all* the sugar refineries in the United States except five, of which four were owned and operated by Pennsylvania corporations — the E. C. Knight Company, the Franklin Sugar Refining Company, Spreckels' Sugar Refining Company, and the Delaware Sugar House — and the other, by the Revere Sugar Refinery of Boston.  These five corporations were all in active competition with the American Sugar Refining Company and with each other.  The product of the Pennsylvania companies was about thirty-three per cent, and that of the Boston company about two per cent, of the entire quantity of sugar refined in the United States.

In March, 1892, by means of contracts or arrangements with stockholders of the four Pennsylvania companies, the New Jersey corporation — using for that purpose its own stock — purchased the stock of those companies, and thus obtained absolute control of the entire business of sugar refining in the United States except that done by the Boston company, which is too small in amount to be regarded in this discussion.

"The object," the court below said, "in purchasing the Philadelphia refineries was to obtain a greater influence or *more perfect control* over *the business* of refining *and selling* sugar *in this country*."  This characterization of the object for which this stupendous combination was formed is properly accepted in the opinion of the court as justified by the proof.  I need not therefore analyze the evidence upon this point.  In its consideration of the important constitutional question presented, this court assumes on the record before us

that the result of the transactions disclosed by the pleadings and proof was the creation of a monopoly in the manufacture of a necessary of life. If this combination, so far as its operations necessarily or directly affect interstate commerce, cannot be restrained or suppressed under some power granted to Congress, it will be cause for regret that the patriotic statesmen who framed the Constitution did not foresee the necessity of investing the national government with power to deal with gigantic monopolies holding in their grasp, and injuriously controlling in their own interest, the entire trade *among the States* in food products that are essential to the comfort of every household in the land.

The court holds it to be vital in our system of government to recognize and give effect to both the commercial power of the nation and the police powers of the States, to the end that the Union be strengthened and the autonomy of the States preserved. In this view I entirely concur. Undoubtedly, the preservation of the just authority of the States is an object of deep concern to every lover of his country. No greater calamity could befall our free institutions than the destruction of that authority, by whatever means such a result might be accomplished. " Without the States in union," this court has said, " there could be no such political body as the United States." *Lane County* v. *Oregon*, 7 Wall. 71, 76. But it is equally true that the preservation of the just authority of the General Government is essential as well to the safety of the States as to the attainment of the important ends for which that government was ordained by the People of the United States ; and the destruction of *that* authority would be fatal to the peace and well-being of the American people. The Constitution which enumerates the powers committed to the nation for objects of interest to the people of all the States should not, therefore, be subjected to an interpretation so rigid, technical, and narrow, that those objects cannot be accomplished. Learned counsel in *Gibbons* v. *Ogden*, 9 Wheat. 1, 187, having suggested that the Constitution should be strictly construed, this court, speaking by Chief Justice Marshall, said that when the original States " converted their league into a

government, when they converted their Congress of Ambassadors, deputed to deliberate on their common concerns, and to recommend measures of general utility, into a legislature empowered to enact laws on the most interesting subjects, the whole character in which the States appear underwent a change, the extent of which must be determined by a fair consideration of the instrument by which that change was effected." "What do gentlemen mean," the court inquired, " by a strict construction? If they contend only against that enlarged construction, which would extend words beyond their natural and obvious import, one might question the application of the term, but should not controvert the principle. If they contend for that narrow construction which, in support of some theory not to be found in the Constitution, would deny to the government those powers which the words of the grant, as usually understood, import, and which are consistent with the general views and objects of the instrument — for that narrow construction, which would cripple the government, and render it unequal to the objects for which it is declared to be instituted, and to which the powers given, as fairly understood, render it competent — then we cannot perceive the propriety of this strict construction, nor adopt it as the rule by which the Constitution is to be expounded." p. 188. On the same occasion the principle was announced that the objects for which a power was granted to Congress, especially when those objects are expressed in the Constitution itself, should have great influence in determining the extent of any given power.

Congress is invested with power to regulate commerce with foreign nations and among the several States. The power to regulate is the power to prescribe the rule by which the subject regulated is to be governed. It is one that must be exercised whenever necessary throughout the territorial limits of the several States. *Cohens* v. *Virginia*, 6 Wheat. 264, 413. The power to make these regulations "is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations, other than are prescribed in the Constitution." It is plenary because vested in Congress " as absolutely as it

would be in a single government having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States." It may be exercised "whenever the subject exists." *Gibbons* v. *Ogden*, 9 Wheat. 1, 195, 196. In his concurring opinion in that case, Mr. Justice Johnson observed that the grant to Congress of the power to regulate commerce carried with it the whole subject, leaving nothing for the State to act upon, and that "if there was any one object riding over every other in the adoption of the Constitution, it was to keep commercial intercourse among the States free from *all* invidious and partial restraints." p. 231. "In all commercial regulations we are one and the same people." Mr. Justice Bradley, speaking for this court, said that the United States are but one country, and are and must be subject to one system of regulations in respect to interstate commerce. *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 494.

What is commerce among the States? The decisions of this court fully answer the question. "Commerce, undoubtedly, is traffic, but it is something more : it is intercourse. It does not embrace the completely interior traffic of the respective States — that which is "carried on between man and man in a State, or between different parts of the same State and which does not extend to or affect other States" — but it does embrace "every species of commercial intercourse" between the United States and foreign nations and among the States, and, therefore, it includes such traffic or trade, buying, selling, and interchange of commodities, as directly affects or necessarily involves the interests of the People of the United States. "Commerce, as the word is used in the Constitution, is a unit," and "cannot stop at the external boundary line of each State, but may be introduced into the interior." "The genius and character of the whole government seem to be, that its action is to be applied to all the external concerns of the nation, *and to those internal concerns which affect the States generally.*"

These principles were announced in *Gibbons* v. *Ogden*, and have often been approved. It is the settled doctrine of this

court that interstate commerce embraces something more than the mere physical transportation of articles of property, and the vehicles or vessels by which such transportation is effected. In *County of Mobile* v. *Kimball*, 102 U. S. 691, 702, it was said that "commerce with foreign countries and among the States, strictly considered, consists in intercourse and traffic, including, in these terms, navigation and the transportation and transit of persons and property, *as well as* the purchase, sale, and exchange of commodities." In *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 203, the language of the court was: "Commerce among the States consists of intercourse and traffic between their citizens, and includes the transportation of persons and property, and the navigation of public waters for that purpose, *as well as* the purchase, sale, and exchange of commodities. The power to regulate that commerce, as well as commerce with foreign nations, vested in Congress, is the power to prescribe the rules by which it shall be governed, that is, the conditions upon which it shall be conducted; to determine when it shall be free, and when subject to duties or other exactions." In *Kidd* v. *Pearson*, 128 U. S. 1, 20, it was said that "the buying and selling, and the transportation *incidental thereto* constitute commerce." Interstate commerce does not, therefore, consist in transportation simply. It includes the purchase and sale of articles that are intended to be transported from one State to another — every species of commercial intercourse among the States and with foreign nations.

In the light of these principles, determining as well the scope of the power to regulate commerce among the States as the nature of such commerce, we are to inquire whether the act of Congress of July 2, 1890, c. 647, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," 26 Stat. 209, is repugnant to the Constitution.

By that act "every contract, combination in the form of trust *or otherwise*, or conspiracy, in restraint of trade or commerce *among the several States* or with foreign nations," is declared to be illegal, and every person making any such contract, or engaging in any such combination or conspiracy,

is to be deemed guilty of a misdemeanor, and punishable, on conviction, by a fine not exceeding five thousand dollars, or by imprisonment not exceeding one year, or by both said punishments in the discretion of the court. § 1. It is also made a misdemeanor, punishable in like manner, for any person to " monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce *among the several States* or with foreign nations." § 2. The act also declares illegal " every contract, combination in form of trust or otherwise, or conspiracy, in restraint of trade or commerce in any Territory of the United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories or any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations," and prescribes the same punishments for every person making any such contract, or engaging in any such combination or conspiracy. § 3.

The fourth section of the act is in these words: " Sec. 4. The several Circuit Courts of the United States are hereby invested with jurisdiction to prevent and restrain violations of this act; and it shall be the duty of the several district attorneys of the United States, in their respective districts, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited. When the parties complained of shall have been duly notified of such petition the court shall proceed, as soon as may be, to the hearing and determination of the case; and pending such petition and before final decree, the court may at any time make such temporary restraining order or prohibition as shall be deemed just in the premises."

It would seem to be indisputable that no *combination* of corporations or individuals can, *of right*, impose unlawful restraints upon *interstate* trade, whether upon transportation or upon such interstate intercourse and traffic as precede trans-

portation, any more than it can, *of right*, impose unreasonable restraints upon the completely internal traffic of a State. The supposition cannot be indulged that this general proposition will be disputed. If it be true that a *combination* of corporations or individuals may, so far as the power of Congress is concerned, subject interstate trade, in any of its stages, to unlawful restraints, the conclusion is inevitable that the Constitution has failed to accomplish one primary object of the Union, which was to place commerce *among the States* under the control of the common government of all the people, and thereby relieve or protect it against burdens or restrictions imposed, by whatever authority, for the benefit of particular localities or special interests.

The fundamental inquiry in this case is, What, in a legal sense, is an unlawful restraint of trade?

Sir William Erle, formerly Chief Justice of the Common Pleas, in his essay on the Law Relating to Trade Unions, well said that "restraint of trade, according to a general principle of the common law, is unlawful;" that "at common law every person has individually, and *the public also have collectively*, a right to require that *the course of trade* should be kept free *from unreasonable obstruction;*" and that "the right to a free course for trade is of great importance to commerce and productive industry, and has been carefully maintained by those who have administered the common law." pp. 6, 7, 8.

There is a partial restraint of trade which, in certain circumstances, is tolerated by the law. The rule upon that subject is stated in *Oregon Steam Nav. Co.* v. *Winsor*, 20 Wall. 64, 66, where it was said that "an agreement in general restraint of trade is illegal and void; but an agreement which operates merely in partial restraint of trade is good, provided it be not unreasonable and there be a consideration to support it. In order that it may not be unreasonable, the restraint imposed must not be larger than is required for the necessary protection of the party with whom the contract is made. *Horner* v. *Graves*, 7 Bing. 735, 743. A contract, even on good consideration, not to use a trade anywhere in England is held void in that country as being too general a restraint of trade."

But a general restraint of trade has often resulted from *combinations* formed for the purpose of controlling prices by destroying the opportunity of buyers and sellers to deal with each other upon the basis of fair, open, free competition. Combinations of this character have frequently been the subject of judicial scrutiny, and have always been condemned as illegal because of their necessary tendency to restrain trade. Such combinations are against common right and are crimes against the public. To some of the cases of that character it will be well to refer.

In *Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Penn. St. 173, 184, 186, 187, the principal question was as to the validity of a contract made between five coal corporations of Pennsylvania, by which they divided between themselves two coal regions of which they had the control. The referee in the case found that those companies acquired under their arrangement the power to control the entire market for bituminous coal in the northern part of the State, and their combination was, therefore, a restraint upon trade and against public policy. In response to the suggestion that the real purpose of the combination was to lessen expenses, to advance the quality of coal, and to deliver it in the markets intended to be supplied in the best order to the consumer, the Supreme Court of Pennsylvania said: " This is denied by the defendants; but it seems to us it is immaterial whether these positions are sustained or not. Admitting their correctness, it does not follow that these advantages redeem the contract from the obnoxious effects so strikingly presented by the referee. The important fact is that these companies control this immense coal field; that it is the great source of supply of bituminous coal to the State of New York and large territories westward; that by this contract they control the price of coal in this extensive market, and make it bring sums it would not command if left to the natural laws of trade; that it concerns an article of prime necessity for many uses; that its operation is general in this large region, and affects all who use coal as a fuel, and this is accomplished by a combination of all the companies engaged in this branch of business

in the large region where they operate. The combination is wide in scope, general in its influence, and injurious in effects. These being its features, the contract is against public policy, illegal, and therefore void." Again, in the same case: "The effects produced on the public interests lead to the consideration of another feature of great weight in determining the illegality of the contract, to wit, the combination resorted to by these five companies. Singly each might have suspended deliveries and sales of coal to suit its own interests, and might have raised the price, even though this might have been detrimental to the public interest. There is a certain freedom which must be allowed to every one in the management of his own affairs. When competition is left free, individual error or folly will generally find a correction in the conduct of others. But here is a combination of all the companies operating in the Blossburg and Barclay mining regions, and controlling their entire productions. They have combined together to govern the supply and the price of coal in all the markets from the Hudson to the Mississippi rivers, and from Pennsylvania to the lakes. This combination has a power in its confederated form which no individual action can confer. The public interest must succumb to it, for it has left no competition free to correct its baleful influence. When the supply of coal is suspended the demand for it becomes importunate, and prices must rise. Or if the supply goes forward, the price fixed by the confederates must accompany it. The domestic hearth, the furnaces of the iron master, and the fires of the manufacturer, all feel the restraint, while many dependent hands are paralyzed and hungry mouths are stinted. The influence of a lack of supply or a rise in the price of an article of such prime necessity cannot be measured. It permeates the entire mass of community, and leaves few of its members untouched by its withering blight. Such a combination is more than a contract; it is an offence. 'I take it,' said Gibson, J., 'a combination is criminal whenever the act to be done has a necessary tendency to prejudice the public or to oppress individuals, by unjustly subjecting them to the power of the confederates, and giving effect to the purpose of the

latter, whether of extortion or of mischief.' *Commonwealth v. Carlisle*, Brightly, (Penn.,) 40. In all such combinations where the purpose is injurious or unlawful, the gist of the offence is the conspiracy. Men can often do by the combination of many what severally no one could accomplish, and even what when done by one would be innocent." "There is a potency in numbers when combined, which the law cannot overlook, where injury is the consequence."

This case in the Supreme Court of Pennsylvania was cited with approval in *Arnot* v. *Pittston & Elmira Coal Co.*, 68 N. Y. 558, 565, which involved the validity of a contract between two coal companies, the object and effect of which was to give one of them the monopoly of the trade in coal in a particular region, by which the price of that commodity could be artifically enhanced. The Court of Appeals of New York held that "a combination to effect such a purpose is inimical to the interests of the public, and that all contracts designed to effect such an end are contrary to public policy, and therefore illegal. . . . If they should be sustained, the prices of articles of pure necessity, such as coal, flour and other indispensable commodities, might be artificially raised to a ruinous extent far exceeding any naturally resulting from the proportion between supply and demand. No illustration of the mischief of such contracts is perhaps more apt than a monopoly of anthracite coal, the region of the production of which is known to be limited." See also *Hooker* v. *Vandewater*, 4 Denio, 351, 352; *Stanton* v. *Allen*, 5 Denio, 434; *Saratoga Bank* v. *King*, 44 N. Y. 87.

In *Central Ohio Salt Co.* v. *Guthrie*, 35 Ohio St. 666, 672, the principal question was as to the legality of an association of substantially all the manufacturers of salt in a large salt producing territory. After adverting to the rule that contracts in general restraint of trade are against public policy, and to the agreement there in question, it was said: "Public policy, unquestionably, favors competition in trade to the end that its commodities may be afforded to the consumer as cheaply as possible, and is opposed to monopolies, which tend to advance market prices, to the injury of the general public.

. . . . The clear tendency of such an agreement is to establish a monopoly, and to destroy competition in trade, and for that reason, on grounds of public policy, the courts will not aid in its enforcement. It is no answer to say that competition in the salt trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. Courts will not stop to inquire as to the degree of injury inflicted upon the public; it is enough to know that the inevitable tendency of such contracts is injurious to the public."

In *Craft* v. *McConoughy*, 79 Illinois, 346, 349, 350, which related to a combination between all the grain dealers of a particular town to stifle competition, and to obtain control of the price of grain, the Supreme Court of Illinois said: "While the argument, upon its face, would seem to indicate that the parties had formed a copartnership for the purpose of trading in grain, yet, from the terms of the contract, and the other proof in the record, it is apparent that the true object was, to form a secret combination which would stifle all competition, and enable the parties, by secret and fraudulent means, to control the price of grain, cost of storage, and expense of shipment. In other words, the four firms, by a shrewd, deep-laid, secret combination, attempted to control and monopolize the entire grain trade of the town and surrounding country. That the effect of this contract was to restrain the trade and commerce of the country, is a proposition that cannot be successfully denied. We understand it to be a well-settled rule of law, that an agreement in general restraint of trade is contrary to public policy, illegal and void, but an agreement in partial or particular restraint upon trade has been held good, where the restraint was only partial, consideration adequate, and the restriction reasonable." "While these parties were in business, in competition with each other, they had the undoubted right to establish their own rates for grain stored and commissions for shipment and sale. They could pay as high or low a price for grain as they saw proper, and as they could make contracts with the producer. So long as competition was free, the interest of the public was safe. The laws of trade, in connection with the right of competition, were all the

guaranty the public required, but the secret combination created by the contract destroyed all competition and created a monopoly against which the public interest had no protection."

These principles were applied in *People* v. *Chicago Gas Trust Co.*, 130 Illinois, 269, 292, 297, which involved the validity of a corporation formed for the purpose of operating gas works, and of manufacturing and selling gas, and which, for the purpose of destroying competition, acquired the stock of four other gas companies, and thereby obtained a monopoly in the business of furnishing illuminating gas to the city of Chicago and its inhabitants. The court, in declaring the organization of the company to be illegal, said: "The fact that the appellee, almost immediately after its organization, bought up a majority of the shares of stock of each of these companies, shows that it was not making a mere investment of surplus funds, but that it designed and intended to bring the four companies under its control, and by crushing out competition to monopolize the gas business in Chicago." "Of what avail," said the court, "is it that any number of gas companies may be formed under the general incorporation law, if a giant trust company can be clothed with the power of buying up and holding the stock and property of such companies, and, through the control thereby attained, can direct all their operations and weld them into one huge combination?"

So, in *India Bagging Association* v. *Kock*, 14 La. Ann. 168, where the court passed upon the legality of an association of various commercial firms in New Orleans that were engaged in the sale of India bagging, it was said: "The agreement between the parties was palpably and unequivocably a combination in restraint of trade, and to enhance the price in the market of an article of primary necessity to cotton planters. Such combinations are contrary to public order, and cannot be enforced in a court of justice."

In *Santa Clara Mill & Lumber Co.* v. *Hayes*, 76 California, 387, 390, which related to a combination, the result of certain contracts among certain manufacturers, the court found that the object, purpose, and consideration of those contracts was to form a combination among all the manufacturers of lumber

at or near a particular place, for the sole purpose of increasing the price of that article, limiting the amount to be manufactured, and giving certain parties the control of all lumber manufactured near that place for the year 1881, and of the supply for that year in specified counties. It held the combination to be illegal, observing that "among the contracts illegal under the common law, because opposed to public policy, were contracts in general restraint of trade; contracts between individuals to prevent competition and keep up the price of articles of utility." It further said that while the courts had nothing to do with the results naturally flowing from the laws of demand and supply, they would not respect agreements made for the purpose of "taking trade out of the realm of competition, and thereby enhancing or depressing prices of commodities."

A leading case on the question as to what combinations are illegal as being in general restraint of trade, is *Richardson* v. *Buhl*, 77 Michigan, 632, 635, 657, 660, which related to certain agreements connected with the business and operations of the Diamond Match Company. From the report of the case it appears that that company was organized, under the laws of Connecticut, for the purpose of uniting in one corporation all the match manufactories in the United States, and to monopolize and control the business of making all the friction matches in the country, and establish the price thereof. To that end it became necessary, among other things, to buy many plants that had become established or were about to be established, as well as the property used in connection therewith. Chief Justice Sherwood of the Supreme Court of Michigan said: "The sole object of the corporation is to make money by having it in its power to raise the price of the article, or diminish the quantity to be made and used, at its pleasure. Thus both the supply of the article and the price thereof are made to depend upon the action of a half dozen individuals, more or less, to satisfy their cupidity and avarice, who may happen to have the controlling interest in this corporation — an artificial person, governed by a single motive or purpose, which is to accumulate money regardless of the wants or neces-

sities of over 60,000,000 people. The article thus completely under their control, for the last fifty years, has come to be regarded as one of necessity, not only in every household in the land, but one of daily use by almost every individual in the country. It is difficult to conceive of a monopoly which can affect a greater number of people, or one more extensive in its effect on the country, than that of the Diamond Match Company. It was to aid that company in its purposes and in carrying out its object that the contract in this case was made between those parties, which we are now asked to aid in enforcing. Monopoly in trade, or in any kind of business in this country, is odious to our form of government. It is sometimes permitted to aid the government in carrying on a great public enterprise or public work under governmental control in the interest of the public. Its tendency is, however, destructive of free institutions and repugnant to the instincts of a free people, and contrary to the whole scope and spirit of the Federal Constitution, and is not allowed to exist under express provisions in several of our state constitutions. . . . All combinations among persons or corporations for the purpose of raising or controlling the prices of merchandise, or any of the necessaries of life, are monopolies and intolerable; and ought to receive the condemnation of all courts."

In the same case, Mr. Justice Champlin, with whom Mr. Justice Campbell concurred, said: "There is no doubt that all the parties to this suit were active participants in perfecting the combination called 'The Diamond Match Company,' and that the present dispute grows out of that transaction, and is the fruit of the scheme by which all competition in the manufacture of matches was stifled, opposition in the business crushed, and the whole business of the country in that line engrossed by the Diamond Match Company. Such a vast combination as has been entered into under the above name is a menace to the public. Its object and direct tendency is to prevent free and fair competition, and control prices throughout the national domain. It is no answer to say that this monopoly has in fact reduced the price of friction matches. That policy may have been necessary to crush competition.

The fact exists that it rests in the discretion of this company at any time to raise the price to an exorbitant degree. Such combinations have frequently been condemned by courts as unlawful and against public policy." See also *Raymond* v. *Leavitt*, 46 Michigan, 447, and *Texas Standard Oil Co.* v. *Adoue*, 83 Texas, 650.

This extended reference to adjudged cases relating to unlawful restraints upon the interior traffic of a State has been made for the purpose of showing that a combination such as that organized under the name of the American Sugar Refining Company has been uniformly held by the courts of the States to be against public policy and illegal because of its necessary tendency to impose improper restraints upon trade. And such, I take it, would be the judgment of any Circuit Court of the United States in a case between parties in which it became necessary to determine the question. The judgments of the state courts rest upon general principles of law, and not necessarily upon statutory provisions expressly condemning restraints of trade imposed by or resulting from combinations. Of course, in view of the authorities, it will not be doubted that it would be competent for a State, under the power to regulate its domestic commerce and for the purpose of protecting its people against fraud and injustice, to make it a public offence punishable by fine and imprisonment, for individuals or corporations to make contracts, form combinations, or engage in conspiracies, which unduly restrain trade or commerce carried on within its limits, and also to authorize the institution of proceedings for the purpose of annulling contracts of that character, as well as of preventing or restraining such combinations and conspiracies.

But there is a trade among the several States which is distinct from that carried on within the territorial limits of a State. The regulation and control of the former is committed by the national Constitution to Congress. Commerce among the States, as this court has declared, is a unit, and in respect of *that* commerce this is one country, and we are one people. It may be regulated by rules applicable to every part of the United States, and state lines and state jurisdiction cannot

interfere with the enforcement of such rules. The jurisdiction of the general government extends over every foot of territory within the United States. Under the power with which it is invested, Congress may remove unlawful obstructions, of whatever kind, to the free course of trade among the States. In so doing it would not interfere with the "autonomy of the States," because the power thus to protect interstate commerce is expressly given by the people of all the States. Interstate intercourse, trade, and traffic is absolutely free, except as such intercourse, trade, or traffic may be incidentally or indirectly affected by the exercise by the States of their reserved police powers. *Sherlock* v. *Alling*, 93 U. S. 99, 103. It is the Constitution, the supreme law of the land, which invests Congress with power to protect commerce among the States against burdens and exactions arising from unlawful restraints by whatever authority imposed. Surely a right secured or granted by that instrument is under the protection of the government which that instrument creates. Any combination, therefore, that disturbs or unreasonably obstructs freedom in buying and selling articles manufactured to be sold to persons in other States or to be carried to other States — a freedom that cannot exist if the right to buy and sell is fettered by unlawful restraints that crush out competition — affects, not incidentally, but directly, the people of all the States; and the remedy for such an evil is found only in the exercise of powers confided to a government which, this court has said, was the government of all, exercising powers delegated by all, representing all, acting for all. *McCulloch* v. *Maryland*, 4 Wheat. 316, 405.

It has been argued that a combination between corporations of different States, or between the stockholders of such corporations, with the object and effect of controlling not simply the manufacture but the price of refined sugar throughout the whole of the United States — which is the case now before us — cannot be held to be in restraint of "commerce among the States" and amenable to national authority, without conceding that the general government has authority to say what shall and what shall not be *manufactured* in the several States.

*Kidd* v. *Pearson*, 128 U. S. 1, was cited in argument as sup-
porting that view. In that case the sole question was,
whether the State of Iowa could forbid the *manufacture*
within its limits of ardent spirits intended for sale ultimately
in other States. This court held that the manufacture of
intoxicating liquors in a State is none the less a business within
the State subject to state control because the manufacturer
may intend, at his convenience, to export such liquors to
foreign countries or to other States. The authority of the
States over the manufacture of strong drinks within their
respective jurisdictions was referred to their plenary power,
never surrendered to the national government, of providing
for the health, morals, and safety of their people.

That case presented no question as to a *combination* to
monopolize the sale of ardent spirits manufactured in Iowa to
be sold in other States — no question as to combinations in
restraint of trade as involved in the buying and selling of
articles that are intended to go, and do go, and will always
go, into commerce throughout the entire country, and are
used by the people of all the States, and the making or manu-
facturing of which no State could forbid consistently with the
liberty that every one has of pursuing, without undue restric-
tions, the ordinary callings of life. There is no dispute here
as to the lawfulness of the business of refining sugar, *apart
from the undue restraint which the promoters of such business,
who have combined to control prices, seek to put upon the free-
dom of interstate traffic in that article.*

It may be admitted that an act which did nothing more
than forbid, and which had no other object than to forbid, the
*mere* refining of sugar in any State, would be in excess of any
power granted to Congress. But the act of 1890 is not of
that character. It does not strike at the manufacture simply
of articles that are legitimate or recognized subjects of com-
merce, but at *combinations* that unduly restrain, because they
monopolize, *the buying and selling of articles* which are to go
into interstate commerce. In *State* v. *Stewart*, 59 Vermont,
273, 286, it was said that if a *combination* of persons " seek to
restrain trade, or tend to the destruction of the material prop-

erty of the country, they work injury to the whole people."
And in *State* v. *Glidden*, 55 Connecticut, 46, 75, the court said :
" Any one man, or any one of several men acting independently,
is powerless ; but when several combine and direct their united
energies to the accomplishment of a bad purpose, the combina-
tion is formidable.   Its power for evil increases as its numbers
increase.   .   .   .   The combination becomes dangerous and
subversive of the rights of others, and the law wisely says
it is a crime."   Chief Justice Gibson well said in *Com-
monwealth* v. *Carlisle*, Brightly, (Penn.,) 36, 41 : " There is
between the different parts of the body politic a reciprocity
of action on each other, which, like the action of antagonizing
muscles in the natural body, not only prescribes to each its
appropriate state and action, but regulates the motion of the
whole.   The effort of an individual to disturb this equilibrium
can never be perceptible, nor carry the operation of his interest
or that of any other individual beyond the limits of fair com-
petition ; but the increase of power by combination of means,
being in geometrical proportion to the number concerned, an
association may be able to give an impulse, not only oppressive
to individuals, but mischievous to the public at large ; and it
is the employment of an engine so powerful and dangerous
that gives criminality to an act that would be perfectly
innocent, at least in a legal view, when done by an individual."
These principles underlie the act of Congress, which has for
its sole object the protection of such trade and commerce *as
the Constitution confides to national control*, and the question
is presented whether the *combination* assailed by this suit is
an unlawful restraint upon interstate trade in a necessary
article of food which, as every one knows, has always entered,
now enters and must continue to enter, in vast quantities, into
commerce among the States.

In *Kidd* v. *Pearson* we recognized, as had been done in pre-
vious cases, the distinction between the mere transportation
of articles of interstate commerce and the *purchasing* and
*selling* that *precede transportation*.   It is said that manufacture
precedes commerce and is not a part of it.   But it is equally
true that when manufacture ends, that which has been manu-

factured becomes a subject of commerce; that buying and selling succeed manufacture, come into existence after the process of manufacture is completed, precede transportation, and are as much commercial intercourse, where articles are bought *to be* carried from one State to another, as is the manual transportation of such articles after they have been so purchased. The distinction was recognized by this court in *Gibbons* v. *Ogden*, where the principal question was whether commerce included navigation. Both the court and counsel recognized buying and selling or barter *as included, in commerce.* Chief Justice Marshall said that the mind can scarcely conceive a system for regulating commerce, which was " *confined* to prescribing rules for the conduct of individuals in the actual employment of buying and selling, or of barter." pp. 189, 190.

The power of Congress covers and protects the absolute freedom of such intercourse and trade among the States as may or must succeed manufacture and precede transportation from the place of purchase. This would seem to be conceded ; for, the court in the present case expressly declare that " *contracts to buy*, sell, or exchange goods *to be transported among the several States*, the transportation and its instrumentalities, and articles bought, sold, or exchanged for the purpose of such transit among the States, or put in the way of transit, *may be regulated*, but this is *because they form part of interstate trade or commerce.*" Here is a direct admission — one which the settled doctrines of this court justify — that contracts to buy and the purchasing of goods *to be transported from one State to another*, and transportation, with its instrumentalities, are all *parts* of interstate trade or commerce. Each part of such trade is then under the protection of Congress. And yet, by the opinion and judgment in this case, if I do not misapprehend them, Congress is without power to protect the commercial intercourse that such purchasing necessarily involves against the restraints and burdens arising from the existence of *combinations* that meet purchasers, from whatever State they come, with the threat — for it is nothing more nor less than a threat — that they *shall not* purchase what

they desire to purchase, *except at the prices fixed by such combinations.* A citizen of Missouri has the right to go in person, or send orders, to Pennsylvania and New Jersey for the purpose of purchasing refined sugar. But of what value is that right if he is confronted in those States by a vast *combination* which absolutely controls the price of that article by reason of its having acquired all the sugar refineries in the United States in order that they may fix prices in their own interest exclusively?

In my judgment, the citizens of the several States composing the Union are entitled, of right, to buy goods in the State where they are manufactured, or in any other State, without being confronted by an illegal combination whose business extends throughout the whole country, which by the law everywhere is an enemy to the public interests, and which prevents such buying, except at prices arbitrarily fixed by it. I insist that the free course of trade among the States cannot coexist with such combinations. When I speak of trade I mean the buying and selling of articles of every kind that are recognized articles of interstate commerce. Whatever improperly obstructs the free course of interstate intercourse and trade, as involved in the buying and selling of articles to be carried from one State to another, may be reached by Congress, under its authority to regulate commerce among the States. The exercise of that authority so as to make trade among the States, in all recognized articles of commerce, absolutely free from unreasonable or illegal restrictions imposed by combinations, is justified by an express grant of power to Congress and would redound to the welfare of the whole country. I am unable to perceive that any such result would imperil the autonomy of the States, especially as that result cannot be attained through the action of any one State.

Undue restrictions or burdens upon the purchasing of goods, in the market for sale, to be transported to other States, cannot be imposed even by a State without violating the freedom of commercial intercourse guaranteed by the Constitution. But if a *State* within whose limits the business of refining sugar is exclusively carried on may not constitutionally im-

pose burdens upon purchases of sugar *to be transported to other States*, how comes it that combinations of corporations or individuals, within the same State, may not be prevented by the national government from putting unlawful restraints upon the purchasing of that article *to be carried from the State in which such purchases are made?* If the national power is competent to repress *State* action in restraint of interstate trade as it may be involved in purchases of refined sugar to be transported from one State to another State, surely it ought to be deemed sufficient to prevent unlawful restraints attempted to be imposed by combinations of corporations or individuals upon those identical purchases; otherwise, illegal combinations of corporations or individuals may — so far as national power and interstate commerce are concerned — do, with impunity, what no State can do.

Suppose that a suit were brought in one of the courts of the United States — jurisdiction being based, it may be, alone upon the diverse citizenship of the parties — to enforce the stipulations of a written agreement, which had for its object to acquire the possession of all the sugar refineries in the United States, in order that those engaged in the combination might obtain the entire control of the business of refining and selling sugar throughout the country, and thereby to increase or diminish prices as the particular interests of the combination might require. I take it that the court, upon recognized principles of law common to the jurisprudence of this country and of Great Britain, would deny the relief asked and dismiss the suit upon the ground that the necessary tendency of such an agreement and combination was to restrain, not simply trade that was completely internal to the State in which the parties resided, but trade and commerce among all the States, and was, therefore, against public policy and illegal. If I am right in this view, it would seem to follow, necessarily, that Congress could enact a statute forbidding such combinations so far as they affected interstate commerce, and provide for their suppression as well through civil proceedings instituted for that purpose, as by penalties against those engaged in them.

In committing to Congress the control of commerce with foreign nations and among the several States, the Constitution did not define the means that may be employed to protect the freedom of commercial intercourse and traffic established for the benefit of all the people of the Union. It wisely forbore to impose any limitations upon the exercise of that power except those arising from the general nature of the government, or such as are embodied in the fundamental guarantees of liberty and property. It gives to Congress, in express words, authority to enact all laws necessary and proper for carrying into execution the power to regulate commerce; and whether an act of Congress, passed to accomplish an object to which the general government is competent, is within the power granted, must be determined by the rule announced through Chief Justice Marshall three-quarters of a century ago, and which has been repeatedly affirmed by this court. That rule is: "The sound construction of the Constitution must allow to the national legislature the discretion with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional." *McCulloch* v. *Maryland,* 4 Wheat. 316, 421. The end proposed to be accomplished by the act of 1890 is the protection of trade and commerce among the States against unlawful restraints. Who can say that that end is not legitimate or is not within the scope of the Constitution? The means employed are the suppression, by legal proceedings, of combinations, conspiracies, and monopolies, which by their inevitable and admitted tendency, improperly restrain trade and commerce among the States. Who can say that such means are not appropriate to attain the end of freeing commercial intercourse among the States from burdens and exactions imposed upon it by combinations which, under principles long recognized in this country as well as at the

common law, are illegal and dangerous to the public welfare? What clause of the Constitution can be referred to which prohibits the means thus prescribed in the act of Congress?

It may be that the means employed by Congress to suppress combinations that restrain interstate trade and commerce are not all or the best that could have been devised. But Congress, under the delegation of authority to enact laws necessary and proper to carry into effect a power granted, is not restricted to the employment of those means "without which the end would be entirely unattainable." "To have prescribed the means," this court has said, "by which government should, in all future time, execute its powers, would have been to change entirely the character of that instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur. To have declared that the best means shall not be used, but those alone without which the power given would be nugatory, would have been to deprive the legislature of the capacity to avail itself of experience, to exercise its reason, and to accommodate its legislation to circumstances." Again: "Where the law is not prohibited, and is really calculated to effect any of the objects entrusted to the government, to undertake here to inquire into the degree of its necessity would be to pass the line which circumscribes the judicial department, and to tread on legislative ground." *McCulloch* v. *Maryland*, 4 Wheat. 316, 415, 423.

By the act of 1890, Congress subjected to forfeiture "any property owned under any contract or by any combination, or pursuant to any conspiracy, (and being the subject thereof,) mentioned in section one of this act, and being in the course of transportation from one State to another, or to a foreign country." It was not deemed wise to subject such property to forfeiture before transportation began or after it ended. If it be suggested that Congress might have prohibited the *transportation* from the State in which they are manufactured of any articles, by whomsoever at the time owned, that had been

manufactured by combinations formed to monopolize some designated part of trade or commerce among the States, my answer is that it is not within the functions of the judiciary to adjudge that Congress shall employ particular means in execution of a given power, simply because such means are, in the judgment of the courts, best conducive to the end sought to be accomplished. Congress, in the exercise of its discretion as to choice of means conducive to an end to which it was competent, determined to reach that end through civil proceedings instituted to prevent or restrain these obnoxious combinations in their attempts to burden interstate commerce by obstructions that interfere *in advance of transportation* with the free course of trade between the people of the States. In other words, Congress sought to prevent the coming into existence of combinations, the purpose or tendency of which was to impose unlawful restraints upon interstate commerce.

There is nothing in conflict with these views in *Coe* v. *Errol*, 116 U. S. 517, 529. There the question was whether certain logs cut in New Hampshire, and hauled to a river that they might be transported to another State, were liable to be *taxed* in the former State before actual transportation to the latter State began. The court held that the logs might be taxed while they remained in the State of their origin as part of the general mass of property there; that "for *this purpose*"— taxation — the property did not pass from the jurisdiction of the State in which it was until transportation began. The scope of the decision is clearly indicated by the following clause in the opinion of Mr. Justice Bradley: "How can property thus situated, to wit, deposited or stored at the place of entrepôt for future exportation, be taxed in the regular way as part of the property of the State? The answer is plain. It can be taxed as all other property is taxed, in the place where it is found, if taxed or assessed for taxation in the usual manner in which such property is taxed; and not singled out to be assessed by itself in an unusual and exceptional manner because of its situation." As we have now no question as to the *taxation* of articles manufactured by one of the combinations condemned by the act of Congress, and

as no one has suggested that the State in which they may be manufactured could not *tax* them *as property* so long as they remained within its limits, and before transportation of them to other States began, I am at a loss to understand how the case before us can be affected by a decision that personal property, while it remains in the State of its origin, although it is to be sent at a future time to another State, is within the jurisdiction of the former State for purposes of taxation.

The question here relates to restraints upon the freedom of interstate trade and commerce imposed by illegal combinations. After the fullest consideration I have been able to bestow upon this important question, I find it impossible to refuse my assent to this proposition: Whatever a State may do to protect its completely interior traffic or trade against unlawful restraints, the general government is empowered to do for the protection of the people of all the States — for this purpose one people — against unlawful restraints imposed upon interstate traffic or trade in articles that are to enter into commerce among the several States. If, as already shown, a State may prevent or suppress a *combination*, the effect of which is to subject its domestic trade to the restraints necessarily arising from their obtaining the absolute control of the sale of a particular article in general use by the community, there ought to be no hesitation in allowing to Congress the right to suppress a similar *combination* that imposes a like unlawful restraint upon interstate trade and traffic in that article. While the States retain, because they have never surrendered, full control of their completely internal traffic, it was not intended by the framers of the Constitution that any part of interstate commerce should be excluded from the control of Congress. Each State can reach and suppress combinations so far as they unlawfully restrain its interior trade, while the national government may reach and suppress them so far as they unlawfully restrain trade among the States.

While the opinion of the court in this case does not declare the act of 1890 to be unconstitutional, it defeats the main object for which it was passed. For it is, in effect, held that the statute would be unconstitutional if interpreted as em-

bracing such unlawful restraints upon the purchasing of goods in one State to be carried to another State as necessarily arise from the *existence* of combinations formed for the purpose and with the effect, not only of monopolizing the ownership of all such goods in every part of the country, but of controlling the prices for them in all the States. This view of the scope of the act leaves the public, so far as national power is concerned, entirely at the mercy of combinations which arbitrarily control the prices of articles purchased to be transported from one State to another State. I cannot assent to that view. In my judgment, the general government is not placed by the Constitution in such a condition of helplessness that it must fold its arms and remain inactive while capital combines, under the name of a corporation, to destroy competition, not in one State only, but throughout the entire country, in the buying and selling of articles — especially the necessaries of life — that go into commerce among the States. The doctrine of the autonomy of the States cannot properly be invoked to justify a denial of power in the national government to meet such an emergency, involving as it does that freedom of commercial intercourse among the States which the Constitution sought to attain.

It is said that there are no proofs in the record which indicate an *intention* upon the part of the American Sugar Refining Company and its associates to put a restraint upon trade or commerce. Was it necessary that formal proof be made that the persons engaged in this combination admitted, in words, that they intended to restrain trade or commerce? Did any one expect to find in the written agreements which resulted in the formation of this combination a distinct expression of a purpose to restrain interstate trade or commerce? Men who form and control these combinations are too cautious and wary to make such admissions orally or in writing. Why, it is conceded that the object of this combination was to obtain control of the business of making and selling refined sugar throughout the entire country. Those interested in its operations will be satisfied with nothing less than to have the whole population of America pay tribute to them. That object

is disclosed upon the very face of the transactions described in the bill. And it is proved — indeed, is conceded — that that object has been accomplished to the extent that the American Sugar Refining Company now controls ninety-eight per cent of all the sugar refining business in the country, and therefore controls the price of that article everywhere. Now, the *mere existence* of a combination having such an object and possessing such extraordinary power is itself, under settled principles of law — there being no adjudged case to the contrary in this country — a direct restraint of trade in the article for the control of the sales of which in this country that combination was organized. And that restraint is felt in all the States, for the reason, known to all, that the article in question goes, was intended to go, and must always go, into commerce among the several States, and into the homes of people in every condition of life.

A decree recognizing the freedom of commercial intercourse as embracing the right to buy goods to be transported from one State to another, without buyers being burdened by unlawful restraints imposed by combinations of corporations or individuals, so far from disturbing or endangering, would tend to preserve the autonomy of the States, and protect the people of all the States against dangers so portentous as to excite apprehension for the safety of our liberties. If this be not a sound interpretation of the Constitution, it is easy to perceive that interstate traffic, so far as it involves the price to be paid for articles necessary to the comfort and well-being of the people in all the States, may pass under the absolute control of overshadowing combinations having financial resources without limit and an audacity in the accomplishment of their objects that recognizes none of the restraints of moral obligations controlling the action of individuals; combinations governed entirely by the law of greed and selfishness — so powerful that no single State is able to overthrow them and give the required protection to the whole country, and so all-pervading that they threaten the integrity of our institutions.

We have before us the case of a combination which absolutely controls, or may, at its discretion, control the price of all

refined sugar in this country. Suppose another *combination*, organized for private gain and to control prices, should obtain possession of all the large flour mills in the United States; another, of all the grain elevators; another, of all the oil territory; another, of all the salt-producing regions; another, of all the cotton mills; and another, of all the great establishments for slaughtering animals, and the preparation of meats. What power is competent to protect the people of the United States against such dangers except a national power — one that is capable of exerting its sovereign authority throughout every part of the territory and over all the people of the nation?

To the general government has been committed the control of commercial intercourse among the States, to the end that it may be free at all times from any restraints except such as Congress may impose or permit for the benefit of the whole country. The common government of all the people is the only one that can adequately deal with a matter which directly and injuriously affects the entire commerce of the country, which concerns equally all the people of the Union, and which, it must be confessed, cannot be adequately controlled by any one State. Its authority should not be so weakened by construction that it cannot reach and eradicate evils that, beyond all question, tend to defeat an object which that government is entitled, by the Constitution, to accomplish. "Powerful and ingenious minds," this court has said, "taking, as postulates, that the powers expressly granted to the government of the Union, are to be contracted by construction into the narrowest possible compass, and that the original powers of the States are retained if any possible construction will retain them, may, by a course of well digested, but refined and metaphysical reasoning, founded on these premises, explain away the Constitution of our country, and leave it, a magnificent structure, indeed, to look at, but totally unfit for use. They may so entangle and perplex the understanding as to obscure principles which were before thought quite plain, and induce doubts where, if the mind were to pursue its own course, none would be perceived." *Gibbons* v. *Ogden,* 9 Wheat. 1, 222.

While a decree annulling the contracts under which the

combination in question was formed, may not, in view of the facts disclosed, be effectual to accomplish the object of the act of 1890, I perceive no difficulty in the way of the court passing a decree declaring that that combination imposes an unlawful restraint upon trade and commerce among the States, and perpetually enjoining it from further prosecuting any business pursuant to the unlawful agreements under which it was formed or by which it was created. Such a decree would be within the scope of the bill, and is appropriate to the end which Congress intended to accomplish, namely, to protect the freedom of commercial intercourse among the States against combinations and conspiracies which impose unlawful restraints upon such intercourse.

For the reasons stated I dissent from the opinion and judgment of the court.