UNITED STATES v. MacANDREWS & FORBES CO. et al.

(Circuit Court, S. D. New York. December, 1906.)

1. MONOPOLIES—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE—INDICTMENT.

An indictment under section 1 or 2 of the anti-trust law of July 2, 1890 (chapter 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), for engaging in a combination in restraint of interstate commerce, or for attempting to monopolize a portion of the same, sufficiently sets out the time of the combination or attempted monopoly when it alleges the time when the several act relied on to establish the offense were done, and it is not essential to set out the precise time when the purpose was formed or the plan of the combination or attempted monopoly was first devised.

2. SAME—COMBINATION AND CONSPIRACY.

Such an indictment for engaging in a combination and also for a conspiracy in restraint of interstate commerce considered, and held, to sufficiently describe the combination and conspiracy.

3. INDICTMENT—DUPLICITY.

An indictment under the anti-trust law of July 2, 1890 (chapter 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), charging in separate counts a combination and a conspiracy in restraint of interstate trade and an attempt to monopolize a portion of such trade, all based in the same transactions, is not bad for duplicity as to either count, on the theory that each alleged overt act set out to support the charge of conspiracy is charged as a separate offense.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, §§ 337–349.]

4. MONOPOLIES—COMBINATIONS IN RESTRAINT OF INTERSTATE COMMERCE—INDICTMENT—JOINDER OF DEFENDANTS—CORPORATIONS AND OFFICERS.

In an indictment under the anti-trust law of July 2, 1890 (chapter 647, 26 Stat. 209 [U. S. Comp. St. 1901. p. 3200]), the offenses thereunder being made misdemeanors, all who aid in their commission may be charged as principals, and a corporation and its officers, who personally participate in committing the same, may be joined as defendants, although their acts may have been separate and not done at the same time.

5. SAME—NATURE OF SCHEMES PROHIBITED—EFFECT ON INTERSTATE COMMERCE.

Whether any given business scheme falls within the prohibition of the anti-trust law of July 2, 1890 (chapter 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), as a combination or conspiracy in restraint of interstate commerce, or an attempt at monopoly of a portion thereof, is to be determined by its effect on interstate commerce, which need not be a total suppression of trade nor a complete monopoly, but it is sufficient if its necessary operation tends to restrain interstate commerce, and to deprive the public of the advantages flowing from free competition.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Monopolies, §§ 10–14.]

6. SAME.

A secret arrangement between two corporations, which together produced about 85 per cent. of all the licorice paste consumed in the United States and sold to consumers throughout the country, by which they ceased competition, fixed from time to time the prices at which each should sell, and apportioned the customers between them, and also by concerted action secured contracts with their chief, if not only competitors, which enabled them to control either the output of such competitors or the prices at which and the persons to whom they should sell, and in pursuance of which scheme they were enabled to and did advance the price of the article to all purchasers nearly 50 per cent. within a few months, was one directly affecting interstate commerce, and constitutes a combination and conspiracy in restraint of such commerce, and an attempt to monopolize a portion of the same, within the prohibition of the anti-trust law of July 2, 1890 (chapter 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]).

[Ed. Note.—For cases in point, see Cent. Dig. vol. 35, Monopolies, § 13.]

7. SAME—JOINDER OF DEFENDANTS IN INDICTMENT.

In an indictment against such corporations under the statute, their presidents, who are alleged to have personally made the arrangement and participated in carrying it out, may be joined as defendants, and cannot claim immunity on the ground that they were not personally engaged in interstate commerce.

8. CORPORATIONS—CRIMINAL RESPONSIBILITY—CONSPIRACY.

A corporation may be liable criminally for the crime of conspiracy.

9. MONOPOLIES—INDICTMENT UNDER ANTI-TRUST LAW—JOINDER OF DEFEND-
ANTS.

A number of defendants may be charged jointly, under section 2 of
the anti-trust law of July 2, 1890 (chapter 647, 26 Stat. 209 [U. S. Comp.
St. 1901, p. 3200]), with the crime of attempting to monopolize a part of
interstate commerce.

On Demurrer to Indictment.

Henry L. Stimson, U. S. Atty., and Edwin N. Hill, Special U. S.
Atty. (Henry W. Taft, Felix H. Levy, Edwin P. Grosvenor, and
Oliver E. Pagan, Special Assistants to the Attorney General, of coun-
sel).

A. H. Burroughs, for corporate defendants.

Ernest E. Baldwin, for individual defendants.

De Lancey Nicoll, W. W. Fuller, John D. Lindsay, and Junius
Parker, of counsel for all the defendants.

HOUGH, District Judge. The indictment demurred to alleges
violations of sections 1 and 2 of the act of July 2, 1890 (chapter 647,
26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), commonly known as
the "Sherman Anti-Trust Law," and contains three counts, the first
charging a combination, and the second a conspiracy in restraint of
interstate trade and commerce, while the third asserts an attempt to
monopolize a portion of the same. All the counts are based upon
the same allegations of fact, and, in effect, assert that the same doings,
facts, and circumstances constitute at once a combination, conspiracy,
and monopoly.

The indictment sets forth in the first count that: (1) Between De-
cember 8, 1903, and June 18, 1906, (2) the corporate defendants were
engaged in certain business, and (3) the individual defendants were
the presidents of the said corporations, and (4) by authority thereof
carried on the same business, which (5) was interstate business, and
(6) amounted to 85 per cent. of the whole trade in licorice paste, (7)
which business should have been conducted competitively as to (8)
prices, (9) relative extent of each company's trade, (10) customers
sought for and obtained by each company, and (11) terms and condi-
tions of sale, and (12) this competitive method of business the cor-
porate defendants would have followed if (13) all the defendants had
not (14) engaged in an unlawful combination, which (15) during
the period first specified (16) they all did engage in, and (17) did so
by the several means next described in the indictment, whereby (18)
interstate trade was restrained (19) in the several ways next also
described. Then follows a general description of the "ways" in
which, and the "means" by which trade was restrained, during the
period alleged, to wit: First competition was destroyed (this is a
"way in which") because (a) the defendants agreed that there should
be no competition, and (b) fixed excessive noncompetitive prices ac-
cordingly, and (c) sold for such prices only, and (d) procured others
to do the like. (a) to (d) are "means by which." The second "way
in which" is that all customers were apportioned among the corporate
defendants and their allies; the third that production was limited, and
the fourth that uniform contracts were required from customers. Ap-

propriate "means" are alleged "by which" the second, third and fourth "ways" were rendered effective.

The first (or combination) count then shows at great length very numerous "overt acts" which are really statements of intended evidence, and reveal the sequence of events and the resulting conditions as follows: Prior to and on December 8, 1903, the MacAndrews & Forbes Company (hereinafter called the "MacAndrews Company") was engaged in the manufacture and sale of licorice paste, having factories in Newark and Camden, in the state of New Jersey, and offices in the city of New York; the J. S. Young Company (hereinafter called the "Young Company") was similarly engaged at Baltimore, Md. The defendants Jungbluth and Young were (and at the time of the presentment of this indictment still were) the presidents of the MacAndrews Company and Young Company, respectively. Licorice paste is a substance made from a root not grown in the United States, and is (beside certain apparently limited uses in pharmacy) a prime necessity for the manufacture of plug and smoking tobacco, as well as of snuff and cigars. At the time first mentioned the MacAndrews Company seems to have been by much the largest producer of paste in this country, and, taken together, the two corporate defendants are said to have supplied about 85 per cent. of our national requirements for this substance. There was and is also a manufacturer in Providence, R. I.—one Lewis—and also one in New York—Weaver & Sterry—neither doing a large business, but both seemingly worthy of consideration. Collectively these four producers of paste appear to have been actually supplying almost the entire trade demand. On December 8, 1903, a written agreement was executed by and between the corporate defendants, whereby, through the device of owning control of the common stock of the Young Company, and guarantying ample dividends on the preferred stock thereof, the MacAndrews Company became for all practical purposes the owner of the Baltimore business, and after that date the Young Company, although maintaining a separate corporate existence, became the creature of the MacAndrews Company, whose officers even issued orders directly to at least one person known to the public only as an agent of the Young Company. Shortly afterward, and on December 31, 1903, the Young Company effected a written contract with Lewis, of Providence, whereby the latter agreed for the space of five years to limit his production to a fixed amount per annum, on which the Young Company guarantied him a certain profit, one-fourth of which, however, was semiannually to flow back to the Young Company, while the profit on any excess production and sale by Lewis was to go entirely to the latter company, which was also given power to regulate Lewis' sale price, provided that his minimum profit was not thereby destroyed. For reasons not shown, Lewis' price was always to be one-quarter of a cent per pound less than that of the Young Company. The subsequently alleged transactions show that the control of Lewis' business thus established extended to limiting his customers, and declaring to whom he could and could not sell his produce.

Three of the four above-mentioned producers of paste having thus been bound together by careful contracts, the Young Company, on

January 2, 1904, authorized Lewis to sell at 7 cents per pound, and on January 11 it informed the trade generally that its price was 7¼ cents. So far as alleged in the indictment trade conditions remained as above outlined until the middle of March, when the defendant Young advised Jungbluth that he thought Weaver & Sterry of New York were ready "to come to some agreement," and quoted Sterry as thinking the time ripe for a "sharp advance." Apparently some of the consumers were of the same opinion, and by May 9th Young wrote that some manufacturers had concluded to "stock up all they can," and furnished Jungbluth with a list of certain orders received by his company, tending to prove the truth of his suspicion. Whereupon, on May 14th the MacAndrews Company, having received an order from a manufacturer on Young's list, replied that they had raised their price to 9 cents per pound, and by circular letter informed the trade to the same effect. Two days later the Young Company advised the trade that their price had risen to 8½ cents, and thereafter it is alleged that the quoted rates for licorice paste furnished by the MacAndrews Company were always higher by ½ cent per pound than those of the Young Company, which in turn gave a price one-quarter of a cent a pound greater than that of Lewis. This "sharp advance" evidently did not quench the desire of some manufacturers to lay in an ample supply of paste against the possibility of a further rise, which desire was met in the instances given by informing one applicant that, "owing to political and other conditions in the licorice root producing countries," no continuing contract for deliveries could or would be made, and telling another that the quantity demanded was beyond his "normal requirements," therefore, only one-quarter of the amount asked for would be sold to him. This last applicant was the well known house of Bagley & Co., and in early June the Young Company warned both Lewis and the MacAndrews Company against this concern's tendency to "stock up," which the defendant Young had so paternally checked. By the end of June, 1904, the negotiations between Young and Weaver & Sterry had resulted in an alleged agreement, not reduced to formal contract, so far as shown, that the uniform minimum price for paste should be fixed at 9½ cents per pound after July 1st, that no contracts for furnishing an indefinite quantity even at that price should be made, and that such price agreement should endure, as between the paste producers, until the close of 1906. Jungbluth was in Europe at this time, but cabled his assent to the scheme on July 2, 1904.

Subsequent events appear to show that for the limited trade permitted to Lewis the minimum price was still to be one-quarter cent per pound lower than that charged by the Young Company and Weaver & Sterry. Immediately after July 2d, therefore, it is alleged that the Young Company advised customers of the 9½ cent price, while the MacAndrews Company quoted 10 cents as their price. Weaver & Sterry having thus been placated, and "maintaining their own prices at not less than 9½ cents," the MacAndrews Company, on July 23d, advised the New York agent of the Young Company that it was "the better policy" for Lewis to enter into "further contracts," the form of

which was then "under discussion." A short time afterwards the form and substance of the proposed contracts was declared to the trade at large; and the perfected trade arrangement is alleged to have been explained in a letter from the Young Company's New York agent to Lewis, substantially as follows: As far as pre-existing contracts would permit, the MacAndrews Company would thereafter sell to no one but the factories affiliated with the American and Continental Tobacco Companies; and in case any other manufacturer attempted to buy from the MacAndrews Company, the action to be taken by that company would "be effective"; and, so far as is shown by the indictment, it was effective, and consisted in uniformly demanding a higher price for the product than any one else suggested. To the "independent tobacco manufacturers" (i. e., others than those comprised in the so-called "trust") Lewis and the Young Company offered a form of contract, binding for two years, whereby the supply demandable by the manufacturer was fixed at a minimum which he had to take, and a 25 per cent. greater maximum, which was all he could get, at 9¾ cents per pound from the Young Company, and 9½ cents a pound from Lewis, with a covenant on the manufacturer's part not to resell, and the price to be subject to increase for the second year. The persons with whom Lewis could make this agreement were fixed ultimately by the MacAndrews Company, which instructed both Lewis and the Young Company to sell to no one whose requirements exceeded 20 cases per annum and who failed to sign the proffered contract. Those who objected to the contract and "very small consumers" (i. e., those using less than 20 cases per year) might still obtain paste at 10¼ cents per pound from Lewis, or 10½ cents per pound from the Young Company; but, as seems to have been authoritatively suggested by the Young Company's agent, the "small people" would "not be able to get their supplies elsewhere, as the MacAndrews Company would have none to sell them anyhow."

The "independent" trade, which seems to mean the general public, did not view the result of these arrangements with pleasure. Instances are alleged of continued endeavors to get paste, first from one and then from another producer. Such infractions of discipline the MacAndrews Company met with a form of letter enjoined upon and distributed by the Young Company, stating that, "in view of present and prospective conditions mainly as to supplies of root," it was thought best to supply only those manufacturers who were "willing to join us in contracts as presented to you," i. e., the two-year obligation heretofore described. These measures were apparently "effective," and by September 2d one firm of the most persistent seekers after licorice paste not furnished under long contract at 9¾ cents per pound had telegraphed their submission, and extended with some humor their "hearty congratulations" to the defendant Young, who had forced the contract upon them; while before the close of that month it is alleged that all demands for paste from persons who had not contracted were bluntly declined for that reason, unless the applicant belonged to the class of "very small consumers," for whom the Young Company's open price was 10½ cents per pound.

If therefore it shall appear that the allegations of the indictment are well pleaded, it is admitted, for the purposes of this hearing, that within the space of eight months the corporate defendants, by the execution of corporate agreements and an arrangement of their corporate activities, in respect of which the individual defendants were the efficient devisers and performers, had obtained substantial control of a business whose produce is essential to one of the largest activities of the country, and had parceled out between themselves and their allies the trade of the Union, so that any given manufacturer's business freedom was reduced to a choice between signing a contract to take what he required from the producer selected for him by the MacAndrews Company, or paying a substantially higher price, than that named in the offered contract, provided he was permitted to buy anything after refusing such contract. During the same short period, and as a part of this successful campaign, the open price of the commodity had been raised nearly 50 per cent., i. e., from 7¼ to 10½ cents per pound, and the increase been made effective for two years— a term not expired at the date of finding this indictment, viz., June 18, 1906.

The second or "conspiracy" count charges that the defendants did "knowingly conspire" and "engage in a conspiracy" in restraint of the same interstate trade within the same period, and did the same things in the same way set forth in the same manner as in the first count; while the third or "monopoly" count charges that "in and by engaging" in the combination first charged the defendants "knowingly attempted to monopolize" the interstate trade in licorice paste.

The specifications of demurrer may be divided into those directed (1) to the form of the indictment, and (2) to the substance thereof.

In point of form it is urged: (a) That the first and third counts do not sufficiently allege the time when the pretended combination or monopoly took place or was committed. (b) That the combination count is bad, because it does not describe the combination, but only its results and effects, without any averment as to how it was to operate in restraint of trade, or that it was when the defendants engaged therein a prohibited combination. (c) That the conspiracy count is bad because it does not sufficiently describe the alleged conspiracy. (d) That all the counts are bad for duplicity, and none of them "charge" the crimes alleged. (e) That in all the counts there is an improper joinder of the corporate and individual defendants, as to which the corporations complain that they are indicted for a violation of law by their officers, while the individuals complain that they are indicted for a violation of law by their corporations, but both declare that they are not jointly indictable therefor.

In point of substance it is urged: (a) That none of the counts describe a crime under the Constitution and laws of the United States, inasmuch as the facts shown can produce at most but an indirect and incidental effect on interstate trade and commerce. (b) That the individual defendants are not alleged to have been, and were not, engaged in interstate commerce. (c) That the individual defendants cannot be guilty under the circumstances shown of any crime under

either section 1 or section 2 of the anti-trust law; every act alleged being a corporate act. (d) That the conspiracy count is bad because a corporation cannot be guilty of conspiracy. And (e) The monopoly count is bad because but one person, acting alone, can be guilty of the offense created by the statute.

(a) Time of combination and monopoly. It is true that the gist of the alleged offenses is the combination or the attempt at monopoly, but it is not true that the offenses are complete when the combination is mentally formed or the mental intention to monopolize arises. The statutory offense, and the one charged herein, does not depend upon "a single agreement, but [on] a course of conduct intended to be continued"; yet, nevertheless, "the thing done and intended to be done is perfectly definite." Swift v. United States, 196 U. S. at page 400, 25 Sup. Ct. 281, 49 L. Ed. 518. That case arose on the civil side of the court, but it is to be remembered that the same facts and acts which expose violators of this statute to civil suit also render them subject to indictment. In this case, while the time is indefinite, the thing done is definite, and that is all that the statute requires.

To show that an exact time may be, and therefore must be, assigned for the commission of the offense of combination, the defendants argue upon the meaning of the word "engage" as used in the statute, and strenuously urge that since the offense prohibited is that of "engaging in" a combination, it must be complete as soon as the accused employs his attention or effort in or about the same, that such employment of attention or effort is capable of precise assignment in point of time, and they challenge the prosecution to name the day.

The statute is not directed against such an abstraction as this. It does not require on the part of the prosecution clairvoyance to discover or locate the offense. Its prohibition is not directed against a state of mind, but against a state of facts. The facts do not simultaneously occur; the events are not contemporaneous. It may, and naturally would, require time for the working parts of the combination to become co-operative, or for the monopoly to become more than a hope; and what is forbidden and renders the actors obnoxious to the criminal law is not an undiscoverable thought or hope, but a perfectly obvious result or condition. The condition or state of facts against which the statute is directed is a continuing condition, and therefore the offense of creating and maintaining that condition is necessarily a continuing offense, and does not, from its very nature, require greater particularity in assignment than is used in this indictment.

(b) Combination not described. The argument that the indictment describes only the results and effects of the combination, but not the combination itself, rests, I think, on a misreading of that instrument. Admitting that it is necessary to charge, not only the commission of the offense, but "all the circumstances constituting" the same (United States v. Greenhut [D. C.] 51 Fed. 205; Re Greene [C. C.] 52 Fed. 104), and excluding from consideration the "overt acts," the combination count not only charges the offense in ampler words than those of the statute, but shows by the "ways in which" the offense was committed all the necessary circumstances; i. e., that the defendant de-

stroyed competition, apportioned customers, limited production, and required uniform contracts. The "means by which" of the indictment are explanatory of the above clear averments, which show both the nature of the combination and the method of its operation.

The special argument for the individual defendants on this branch of the demurrer seems to me to rest on the idea that there must have been a time when the corporations entered into a contract or contracts, which contractual relation was, in and of itself, the prohibited combination, and that the statute should not be construed to apply to those who, not being parties to such original agreement, merely participated at a subsequent time in furthering the objects thereof. "Combination" is a word not yet possessed of an accurate legal meaning; its place in the terminology of criminal law is, I believe, no older than this statute. Of itself it means no more than "co-operation"—a union of effort— and if I am right in believing the act to be aimed at the result of such united effort or co-operation, it can make no difference whether those personally assisting in or contributing to such wrongful result were original laborers in the vineyard or came at the eleventh hour; their statutory recompense is the same.

(c) The conspiracy not described. Unlike "combination," "conspiracy" is a term of art. In the anti-trust law it is to be interpreted independently of the preceding words (United States v. Debs [C. C.] 64 Fed. at page 747), and an indictment thereunder should therefore describe something that amounts to a conspiracy under the act conformably to the rules of pleading at common law, as perhaps modified by general federal statutes. The elements of conspiracy to be here considered are that it must depend upon the concerted action of two or more persons to accomplish an unlawful result by any means, or a lawful result by unlawful means. Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419. The statute declares, in effect, that if the purpose of the concerted action is to restrain trade between the states, such purpose is unlawful, and the concert of action is a conspiracy. It is wide enough to cover, not only a destruction of the trade of competitors by wrongful means, as in United States v. Patterson (C. C.) 55 Fed. 605, but any restraint of interstate trade if the same be accomplished by a predetermined and concerted action of two or more individuals. It is not necessary on demurrer to draw a distinction between the crimes of combination and conspiracy; the sole question is whether the second count states a conspiracy within the act. It is admitted that "what was done in pursuance of the alleged conspiracy is irrelevant, and cannot be laid hold of to enlarge the necessary allegations of the indictments" (United States v. Patterson, supra, at page 639 of 55 Fed.; United States v. Britton, 108 U. S. 204, 2 Sup. Ct. 531, 27 L. Ed. 698). Laying aside, therefore, the details of the "overt acts," I believe, by the same reasoning hereinbefore applied to the combination count, that the conspiracy count does describe both the nature of the combined action and the illegality of the object sought to be accomplished.

(d) Duplicity, etc. The analysis of the indictment first above made convinces me that each alleged offense is sufficiently charged. The

suggestion of duplicity rests upon the assumption that each one of the alleged "overt acts" is charged as a separate indictable offense. The same analysis shows the error in this argument. The true reason for the rule against duplicity is that the "jury cannot split up a count in an indictment, and find the accused guilty of a part and not guilty of the balance; their verdict must be an entirety." State v. Smith. 61 Me. 386. I can see no possibility of the jury being thus misled in this case.

(e) Improper joinder. By this branch of the demurrer all the defendants admit that the acts alleged were done. The individuals aver that, ex necessitate rei, the acts were of the corporation. The corporations declare that, inasmuch as no corporation can commit a crime except through human instrumentality, the acts were human; but, as there was but one crime, it must be fundamentally wrong to charge both the corporation and its instrument therewith. This argument seems to depend upon the assumption that every factum set forth in the indictment is a piece of joint activity by all the defendants. This is not true. It is charged that the unlawful combination, conspiracy, or monopoly was the result of joint action, but all of the persons alleged to be jointly responsible were not necessarily all doing the same things at the same time. There is nothing inherently impossible in the corporations doing one thing and the individuals another at or about the same time, which things were utterly different; yet all, when dovetailed together, go to make up the joint product labeled by the act—combination, conspiracy, or monopoly. It is conceivable that the evidence may show that the individual defendants were not free agents, but acted under a species of corporate coercion, for which they should not be held personally responsible; but it is impossible to arrive at this conclusion on demurrer. The series of cases arising under the indictment regarding the Distilling & Cattle Feeding Company (In re Greene [C. C.] 52 Fed. 104, U. S. v. Greenhut, 51 Fed. 205, and In re Terrell [C. C.] 51 Fed. 213), show no more than that the courts have conclusively presumed that the relation between a corporation and its stockholder is not such that the latter can be held to criminal responsibility for a violation of the law in which he is not alleged to have personally participated.

It is not without significance that offenses as serious, in congressional opinion, as those created by this statute are made misdemeanors. When the statute declares that certain acts notoriously to be accomplished under modern business conditions only through corporate instrumentality shall be misdemeanors, and further declares that the word "person" as used therein shall be deemed to include corporations, such statute seems to me clearly passed in contemplation of the elementary principle that in respect of a misdemeanor all those who personally aid or abet in its commission are indictable as principals. This is learnedly and fully treated by Van Brunt, J., in People v. Clark (O. & T.) 14 N. Y. Supp. 642, and I am compelled to the conclusion that, under this statute, if the officer or agent of a corporation charged with fault be also charged with personal participation, direction, or activity therein, both may be so charged in the same indictment. This procedure has been followed in People, etc., v. Detroit White Lead Works, 82 Mich.

471, 46 N. W. 735, 9 L. R. A. 722, and Overland Cotton Mill v. People, etc., 32 Colo. 263, 75 Pac. 924, 105 Am. St. Rep. 74; nor do I think the holding in the rebates cases (United States v. N. Y. C. & H. R. R. et al., lately decided in this court, 146 Fed. 298) irrelevant to the present issue. The indictments in those cases were based upon those clauses of section 1 of the act of February 19, 1903 ("Elkins Act") chapter 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599], which declares that "anything done * * * by a corporation * * * which if done * * * by any * * * officer thereof * * * would constitute a misdemeanor * * * shall also be held to be a misdemeanor committed by such corporation," and "every person or corporation who shall * * * grant or give * * * any * * * rebate * * * shall be deemed guilty of a misdemeanor." This is not a specific authorization for a joint indictment; it is a declaration that the same act shall at one and the same time be a misdemeanor on the part both of the officer, who is the actor, and the corporation, who suffers him to act. The language of that statute seems to me to render a joint indictment permissible, but if, as in this case and under this statute, that which is complained of is not one single act, which is at the same time individual by nature and corporate by act of Congress, but a condition of facts to which both corporate and individual action may be contributed, a joint indictment is not only permissible, but, if it be desired to bring in all the actors and produce all the evidence, it may even be necessary.

Having concluded that the material allegations of the indictment are well pleaded, there remain for consideration the objections going to the merits of the charges.

(a) No direct effect on interstate commerce shown. Commerce among the states is not a technical legal conception, but a practical one, drawn from the course of business. The criterion as to whether any given business scheme falls within the prohibition of the statute is its effect upon interstate commerce, which need not be a total suppression of trade nor a complete monopoly; it is enough if its necessary operation tends to restrain interstate commerce, and to deprive the public of the advantages flowing from free competition. Cf. U. S. v. Chesapeake & Ohio Fuel Co. (C. C.) 105 Fed. at page 93; Swift v. United States, 196 U. S., at page 375, 25 Sup. Ct. 281, 49 L. Ed. 518; Northern Securities Co. v. United States, 193 U. S., at page 382, 24 Sup. Ct. 436, 48 L. Ed. 679. Applying these general considerations and the case of Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 20 Sup. Ct. 96, 44 L. Ed. 136, to the case in hand, I have no doubt that the arrangement alleged in the indictment immediately, directly, and of intention restrained interstate trade. It is enough to instance the allotment of certain tobacco manufacturers to certain paste producers by a secret agreement that only the assigned producer would or could supply the needs of the manufacturer. This is a restraint of trade surpassing anything shown in the Addyston Case. Defendants seem to regard the original agreement between the MacAndrews Company and the Young Company as the gist of this proceeding. That was but the first step, and the law looks not at any particular act, but at the

aggregate effect of all the acts. The whole series of transactions is to be judged by its fruit, and not by the legal significance of any one occurrence.

It may be admitted (to paraphrase the language of Jackson, J., in Re Greene [C. C.] 52 Fed., at page 116) that the ownership by the defendant corporations of all the licorice paste in this country is not what the statute condemns, but it does condemn the monopoly of, or attempt to monopolize, the interstate trade or commerce therein. These corporate defendants are said not only to have obtained control of their principal, if not their only, competitors, but, having done this (which may be within the decision in the case of Sugar Refining Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325), they have seen to it that their product was followed from factory to consumer, until with their system working perfectly they not only controlled the source of supply and regulated production, but regulated the consumption of every person in the land who required what they made. This conduct "directly concerned the shipment of goods from one state to another," and operated, "not alone upon the manufacturer, but upon the sale, transportation, and delivery of an article of interstate commerce by preventing or restricting its sale." Montague v. Lowrie, 193 U. S. 38, 24 Sup. Ct. 307, 48 L. Ed. 608, as cited in 193 U. S. 390, 24 Sup. Ct. 436, 48 L. Ed. 679. Not only do the facts alleged show a combination producing a result detrimental to interstate commerce, but they also show concerted action to bring about that result, and the result as shown constitutes that "virtual" monopoly in the interstate distribution of the substance manufactured by the corporate defendants which brings the matter within the decisions differentiating the modern use of the word "monopoly" from that grant by royal patent which was the origin of the phrase. People, etc., v. North River Sugar Ref. Co., 121 N. Y. 582, 24 N. E. 834, 9 L. R. A. 33, 18 Am. St. Rep. 843; Id., 54 Hun, 354, 3 N. Y. Supp. 401, 2 L. R. A. 33, 7 N. Y. Supp. 406, 5 L. R. A. 386; State v. Standard Oil Co., 49 Ohio St. 137, 30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541; De Witt Wire Cloth Co. v. N. J. Wire Cloth Co. (Com. Pl.) 14 N. Y. Supp. 277; Nat. Cotton Oil Co. v. Texas, 197 U. S. 115, 25 Sup. Ct. 379, 49 L. Ed. 689; United States v. Knight, 156 U. S., at page 17, 15 Sup. Ct. 249, 39 L. Ed. 325.

(b and c) Individual defendants not engaged in interstate commerce, and every act alleged a corporate act. It is seriously urged that every act alleged in the indictment is a corporate act, and that, as the individual defendants are presidents of the corporations, therefore the acts are not their acts, even though they actively performed them; and further, even if such corporate acts operated on and related to interstate commerce, that the men who gave the orders, wrote the letters, and signed the contracts were not in so doing engaged in interstate commerce.

As to the first branch of this argument I refer to my already stated opinion, that it cannot be ascertained upon demurrer whether the acts were all corporate acts or not, or whether or to what extent the in-

dividual defendants in doing what they did were acting as mere clerks, or as advisers, devisors, or abettors.

If the second branch of the argument is sound, it must result that the president of a railroad and the president of a college are engaged in the same business, i. e., that of being president. It might as well be said that the governor of a state and the governor on a steam engine are both engaged in the business of being governor.

(d) Corporation cannot conspire. The doctrine, much older than the Dartmouth College Case, 4 Wheat., at page 636, 4 L. Ed. 629, but there fixed in federal jurisprudence, that a "corporation is an artificial being, invisible, intangible, existing only in contemplation of law, and, being the mere creation of law, it possesses only those properties which the charter of its creation confers," has been the excuse for much idle and artificial reasoning. It was long contended that even a civil liability arising from evil intent could not be visited upon an artificial being. This fiction has vanished, and corporate liability on the civil side firmly established, even for assault (Lake Shore, etc., Ry. v. Prentice, 147 U. S. 101, 13 Sup. Ct. 261, 37 L. Ed. 97), or conspiracy (Buffalo Oil Co. v. Standard Oil Co., 42 Hun, 153; Id., 106 N. Y. 669, 12 N. E. 826; West Va. Trans. Co. v. Standard Oil Co., 50 W. Va. 611, 40 S. E. 591, 56 L. R. A. 804, 88 Am. St. Rep. 895). It was even longer denied that a corporation could be indicted at all. Regina v. Great, etc., Ry., 9 Q. B., 314. In People, etc., v. Clark, supra, the court declares that the legal reasoning upholding this contention was the strange argument that a corporation could not plead in person, and therefore could not be called on to answer criminally. It certainly is now admitted law that not only may corporations (the art of pleading by attorney having been discovered) be indicted for nonfeasance, but for such deeds of misfeasance as are complete by the mere doing of the thing prohibited, e. g., violation of the eight hour law (United States v. John Kelso Co. [D. C.] 86 Fed. 304); receiving usurious interest (State v. First Nat. Bank, 2 S. D. 568, 51 N. W. 587); not stopping gaming at a fair (Commonwealth v. Agricultural Soc., 92 Ky. 197, 17 S. W. 442).

Authority is still producible, however, for the dogma that corporations "cannot be indicted for offenses which derive their criminality from evil intention" (Commonwealth v. Proprietors of New Bedford Bridge, 2 Gray [Mass.] 339), nor "for any crime of which a corrupt intent or malus animus is an essential ingredient" (State v. Morris & Essex Ry., 23 N. J. Law, 260). Therefore, these defendant corporations claim that since in conspiracy evil intent is of the essence of the crime, inherent impossibility renders the accusation futile. I think this is but the remnant of a theory always fanciful and in process of abandonment. The process is slow, but in Telegram Newspaper Co. v. Commonwealth, 172 Mass. 294, 52 N. E. 445, 44 L. R. A. 159, 70 Am. St. Rep. 280, a court of great authority recently held in a proceeding for criminal contempt:

"We think that a corporation may be liable criminally for certain offenses of which a specific intent may be a necessary element. There is no more difficulty in imputing to a corporation a specific intent in criminal proceedings than in civil."

. And to the same effect State v. B. & O. R. R., 15 W. Va. 362, 36 Am. Rep. 803. It is notable that the older cases asserting the immunity here contended for are rarely decisions granting such immunity, but speak of it as something theoretically true, yet not applicable to the matter in hand. It seems to me as easy and logical to ascribe to a corporation an evil mind as it is to impute to it a sense of contractual obligation. There is an obvious physical difficulty in rendering a corporation amenable to corporal punishment, but there is no more intellectual difficulty in considering it capable of homicide or larceny than in thinking of it as devising a plan to obtain usurious interest. The limitation of power does not depend upon the difficulty of imputing evil intent, but upon the impossibility of visiting upon corporations the punishments usually prescribed for greater crimes. The same law that creates the corporation may create the crime, and to assert that the Legislature cannot punish its own creature because it cannot make a creature capable of violating the law does not, in my opinion, bear discussion.

(e) Monopoly by one only. Section 2 of the act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) undoubtedly renders it possible for one single person to be punished under this statute for either a monopoly or an attempt to monopolize, whereas it is difficult to imagine one person combining, and, obviously, one person cannot conspire. But having regard to the modern use of the word "monopoly" as meaning something quite different from the royal grant of earlier law, I see no reason why any number of persons may not enjoy a monopoly, or may not attempt to monopolize. Furthermore, it is to be remembered that even when monopoly had its ancient meaning, the grant of the right was not limited to one person; the granteed were frequently in the plural.

Let the demurrers be overruled.